FEBRUARY TERM, 1860.          805

Conn. & Pass. R. R. R. Co. *v.* Baxter.

THE CONNECTICUT AND PASSUMPSIC RIVERS RAILROAD COMPANY *v.* WILLIAM H. BAXTER.

*Contract.   Railroads.   Ambiguity.   Evidence.   Practice.   Agent. Jury.*

A subscription for the stock of a railroad company, provided that the money so subscribed should be expended in the construction of the road from St. Johnsbury to Derby Line, and also that it should not be binding until the whole road from St. Johnsbury to Derby Line should be put under contract for grading. *Held,* that this was not merely a general description of the road, requiring the whole of it to be put under contract before the subscription was payable, but that it created an express condition to the validity of the subscription, that the road should be put under contract as far north as Derby Line.

*Held,* also, that the term *Derby Line,* in the absence of any evidence as to its meaning, except the subscription itself, and the fact that the charter fixed the northern terminus of the road in the north line of Derby, must be construed to mean the north line of Derby.

But, the defendant, having shown that the words *Derby Line,* in common usage, meant a village of that name in Derby, *it was held,* that it became a question of fact for the jury to decide, whether that expression in this contract, meant the north line of Derby, or the village named *Derby Line.*

In an action to recover the amount of the defendant's subscription for a portion of the plaintiff's capital stock, the plaintiff offered to prove that at a public meeting of the friends of the road, held in the neighborhood of the village of Derby Line, prior to the defendant's subscription, a form for the conditions of subscription was under discussion, in which the words "Derby Line Village" were used to signify the northern terminus, and that the word *Village* was stricken out therefrom, at the request of some one who argued and believed that the expression *Derby Line* would leave open the question of terminus to be subsequently fixed at any point in the north line of Derby; but the plaintiff did not offer to prove, and did not prove, that the defendant was present at, or ever aware of such meeting. *Held,* that the testimony was inadmissible, and that it was error to admit it, notwithstanding the court in their charge to the jury, instructed them that it was immaterial.

*Held,* also, that evidence was inadmissible to prove that the route adopted, which terminated in the north line of Derby, and not at Derby Line Village, was more feasible, and better for the company and the public, than any route leading to that village.

*Held,* also, that if the plaintiffs' agent, who obtained the defendant's subscription represented that the route, intended by the written condition, was one

terminating at Derby Line Village, and the defendant subscribed in reliance upon such representation, the plaintiff was bound thereby, whether it was made fraudulently, or not.

ASSUMPSIT upon the defendant's subscription for twenty shares of the capital stock of the plaintiffs' company. Plea, the general issue and trial by jury, at the May Term, 1859,—REDFIELD, Ch. J., presiding.

On trial, the plaintiffs introduced in evidence their subscription book, showing that the defendant on the 24th of March, 1853, subscribed for twenty shares of the capital stock, and at the same time subscribed the following contract.

"Whereas, the Connecticut and Passumpsic Rivers Railroad Company propose to extend said Railroad from St. Johnsbury, via Barton, to Derby, if means can be obtained for that object; now, for the purpose of extending said railroad, we, the subscribers, agree to associate ourselves with the said company, and hereby promise and agree to pay to said company, the sum of one hundred dollars for each and every share set against our respective names, in installments of ten per cent. on each share, to be expended by the directors of said company in the extension and construction of said railroad from St. Johnsbury, via Barton, to Derby Line, provided that the undersigned shall not be obliged to pay any part of our subscriptions until the whole road from St. Johnsbury, via Barton, to Derby Line, shall be put under contract for grading, and that sixty days notice shall be given by the treasurer or directors of said company to us, for each and every installment required to be paid on the shares subscribed. And it is further understood, that the term of at least sixty days shall elapse between the periods that the different installments shall be called for, so that no installment shall be required within sixty days of the date of the requisition of the next preceeding installment."

The plaintiffs also proved that four assessments of ten dollars each upon each share had been laid upon the capital stock, and due notice thereof given, all of which were due before the commencement of this action, and that two of the assessments made against the defendant had not been paid.

The plaintiffs also introduced in evidence a written contract

made October 27th, 1855, between them and one Balch, for the construction by the latter of the plaintiffs' railroad, north from St. Johnsbury to its termination on the Canada line, which contract provided that the location of the road from Barton to the Canada line should be determined by certain persons therein named. The plaintiffs offered to prove that those persons established such location upon the western route, so called, terminating in the town of Derby, upon the Canada line, three and one-third miles west of the village of "Derby Line," and that this route was better for the company and for the public than either the "middle" or the "eastern route," so called, both of which terminated in the village of Derby Line ; and that the plaintiffs accordingly adopted the location by the *western route*. This evidence was objected to by the defendant, but was admitted by the court, to which the defendant excepted.

The plaintiffs then offered to prove, and under objections from the defendant were allowed to prove, by several witnesses, that they had ever understood the word, "Derby Line," when used in connection with the plaintiffs' railroad, to signify, the north line of the town of Derby. To the admission of this evidence the defendant also excepted.

It appeared upon cross-examination of these witnesses, and was virtually conceded by the plaintiffs, that the words "Derby Line," in their common use, in that vicinity, signified a village of that name in Derby, situated upon the Canada line, and that no other place bore that name.

The plaintiffs here rested their case, and the defendant insisted that upon this evidence the plaintiffs could not recover, as their proof had not shown, or tended to show, any performance by them, of the conditions of the defendant's contract, but on the contrary a failure, to put the road under contract for grading to "Derby Line." But the court held that it was a question for the jury to decide, what was the meaning of the words "Derby Line" in the defendant's contract, and that those words, in that connection, were *equivocal*, and admitted and required evidence *aliunde* as to their meaning. To this ruling of the court the defendant excepted.

The defendant then introduced testimony tending to show that in

Derby and the vicinity of the place where the defendant's contract was made, the words "Derby Line" were universally used as meaning the village of that name, and that prior to his subscription the plaintiffs' company contemplated and held out to the public the adoption of a route through the village of Derby Line, and that they had never, before he subscribed, intended or proposed any other ; that the directors of the company, and the agent who obtained his subscription for the stock, represented to him that such route was to be the route of the road, and that he subscribed with such understanding, relying upon these representations and upon the words of the contract. It appeared that the charter of the road fixed its northern terminus as the Canada line, either in the town of Derby or Newport, but the defendant testified that he had no knowledge of the terms of the charter in this respect.

The plaintiffs then offered testimony tending to show that at a public meeting of the friends of the extension of the plaintiffs' road from St. Johnsbury, held at Stanstead, in Canada, only a mile or two from the village of Derby Line, prior to the defendant's subscription, a form for conditions of subscription was discussed, in which the words "Derby Line Village" were used to signify the northern terminus, and that the word "Village" was stricken out of such form, at the request of some one, who argued and believed that the words "Derby Line" would leave open the question of terminus to be subsequently fixed at any point on the north line of Derby.

It was not claimed by the plaintiffs that the defendant was present at, or knew of any of the sayings or doings at that meeting, and the testimony was objected to by the defendant, but was admitted by the court, subject to objection thereafter, to which admission the defendant excepted.

The defendant then insisted that there was no evidence in the case to go to the jury of any common or proper use of the words "Derby Line" in any other sense than as designating the village of that name, and none that the plaintiffs, or their agents, or the defendant ever used or understood the words in any other sense in connection with their railroad.

But the court held that the case upon this point was a proper

one to be submitted to the jury, to which the defendant excepted.

The defendant requested the court to charge the jury that if the plaintiffs' agent who obtained the defendant's subscription, represented to him that the route intended by the contract signed by him, was the one terminating at the village of Derby Line, and that the plaintiff signed the contract, relying upon such representation, the plaintiff was bound thereby, whether it was made fraudulently or not.

The court, among other things not excepted to, charged the jury that the mere fact that the road did not go where the defendant expected it would go when he subscribed, is not sufficient to avoid his subscription, unless the agent who took his subscription represented that the road would go by Derby Line Village, more strongly than he or the directors honestly believed would be the case; that if there was no fraud in this respect, and the words "Derby Line" used in the contract, did not, in the opinion of the jury, mean the village of that name, the corporation had the right, as against this defendant, to build their road to any point in the north line of Derby; that the change made in the subscription paper at the meeting at Stanstead, by striking out the word "village" was of no importance as evidence in this case unless such change was known to the defendant before he subscribed, and he acquiesced in it as altering the legal construction of the contract of subscription; and that if, after that word was struck out, the expression "Derby Line" really meant Derby Line village, the same as before, or if the defendant subscribed, understanding that to be its meaning, and the agent taking his subscription knew that such was his understanding, the legal import of the terms would, so far as the defendant was concerned, be controlled by, and be the same as such understanding.

To so much of the charge of the court as is above recited, the defendant excepted.

*Peck & Colby* for the defendant.

*T. P. Redfield* and *Washburn & Marsh* for the plaintiffs.

PIERPOINT, J. This action is brought upon a contract entered into by the defendant with the plaintiffs, by which he subscribed and agreed to pay for, twenty shares of the capital stock of the plaintiffs' company. The contract contains the following condition : " Provided that the undersigned shall not be obliged to pay any part of our subscriptions, until the whole road from St. Johnsbury, via Barton, to Derby Line, shall be put under contract for grading."

It is insisted on the part of the plaintiffs, that this is not a condition requiring a contract for the grading of this road over, or terminating at, any precise locality, but is only a general description of the road referred to, and requiring that the whole should be put under contract before the subscribers should be called on for their subscriptions, without reference to any particular point of termination, as the one to which the company was to extend the road.

This view of the contract we think is not correct. It is quite obvious from the terms of the contract, that it was the intention of the subscribers to make it a condition on which their liability was to depend, not only that the whole road should be put under contract, but that such road should run from St. Johnsbury, by the way of Barton, to Derby Line. This is clearly indicated by what immediately precedes the proviso, where it is declared that the money subscribed, is " to be expended by the Directors of said company, in the extension and construction of said railroad from St. Jonhsbury, via Barton, to Derby Line."

These provisions we think place the question beyond all controversy, that the northern terminus of this road must be at Derby Line, or there can be no compliance with the conditions contained in the defendant's contract.

The question then arises, has this condition been complied with ? To determine this, we must first ascertain what point is referred to in the condition as the northern termination of the contemplated road ; or, what point is indicated by the words " Derby Line " as used in this contract ? The contract as reduced to writing, commences with a statement of the proposal of the company, to extend their road " from St. Johnsbury, via Barton, to Derby." Of the existence of these places as incorporated towns

within this State, courts will take judicial notice. The acts of our legislature chartering railroad companies are declared to be public acts, and of their existence, courts will also take judicial notice. Taking this contract in connection with these facts, which is all the court is supposed to know on the subject, in the absence of proof, and the conclusion would seem to be irresistible that when the parties in a subsequent part of the contract use the term Derby Line, as the point to which the grading of the road is to be contracted for, they refer to some one of the lines which constitute the boundaries of the town of Derby. The terms of the condition, strictly considered, would be complied with by putting the road under contract to the south line of the town, or that line of the town that should be first reached by the road in its course from St. Johnsbury onward, by the way of Barton. And if there was nothing to be considered but this clause of the contract itself, probably that would be its true construction. But when considered in connection with the charter of the company, which extends the road to the north line of Derby, and the words of the contract, "that the *whole road* from ' St. Johnsbury, via Barton, to Derby Line' shall be put under contract," we think the fair construction .of the condition of the contract, when viewed in connection with these facts, is, that the road should be put under contract to the north line of the town of Derby. What knowledge the members of the court may possess individually, on the subject, is a matter of no importance. As *a court*, they can know only those facts that are proved, or those of which they are bound to take judicial notice. In this case they can have no knowledge of the existence of any place, that the parties could have referred to, as Derby Line, except the boundary line of the town. Of the existence of any village or other precise part known as Derby Line, to which the parties could have referred, the court cannot know until the fact is legitimately proved.

Upon the trial in the county court, all the evidence the plaintiffs were required to introduce to show that they had complied with the conditions of the contract was, that they had put the road "under contract for grading," from St. Johnsbury, via Barton, to the north line of the town of Derby.

If the defendant claims that the parties, in using these words

in the contract, intended to refer, and did refer to another point, different from that of the north line of the town, he must first show that there is some other point, known by that name, to which the parties could with propriety have referred by those terms, and to which they did refer. By introducing testimony to show that a village situated on the north line of the town of Derby was universally known and called, whenever it was known at all, by the name of Derby Line, the defendant raises a doubt as to the true construction of the condition in this contract. When this fact is introduced into the case it becomes apparent that the words used can be applied with as much propriety to this village as to the town line, and in fact with more propriety, for when so applied no doubt is left as to the precise location referred to; but when applied to the town line, a doubt is still remaining as to *which* line of the town is referred to.

When this ambiguity is raised it becomes a question of fact to be settled by the jury, upon the evidence legally admissible for that purpose, and under proper instructions from the court.

It is insisted on the part of the defendant that the court erred in submitting the question to the jury, as to what the parties intended by the use of these words, inasmuch as the case shows that the defendant proved the fixed, invariable application of the words "Derby Line" to the village so named. But it must be borne in mind that those words became equivocal when the fact was established that the village was called by that name, and it then became a question of fact as to what the parties intended by them, whether the village or the line of the town, and it was upon this question that all the evidence, as to the application of those words to the *village* in Derby, and not to the town line, by the inhabitants in the vicinity, was admitted. The more full and perfect the proof, the greater the probability of satisfying the jury and obtaining a verdict, but no amount of testimony on the point, of this character, could have the effect to change this question of fact to one of law, so as to warrant the court in taking it from the jury and deciding it as a matter of law.

Indeed, all the evidence as to the general understanding of the meaning of this expression in the vicinity, has no direct application on the real question in issue; it bears only on the probabili-

ties of the case, and if it had been proved, beyond all question, that prior to the making of this contract this expression had never been used with reference to the town line, it would not have been conclusive. The expression being a proper one to use in that connection, these parties may have used it in that sense in this contract for the first time. The question would still be open for the jury to say in what sense the parties *in fact* used it.

The county court evidently took this view of the case, and we think were entirely correct in so doing.

This conclusion disposes of a number of objections raised in the argument by the counsel for the defendant.

It is further urged that the county court erred in admitting evidence of the proceedings at a public meeting held at Stanstead, and also as to the nature and feasibility of the middle and eastern routes as compared with the western route, which was ultimately adopted.

The evidence of the proceedings of the meeting at Stanstead we think was not admissible. It was not claimed by the plaintiffs when this testimony was offered, that the defendant was present at the meeting, or had any knowledge of what was said or done there ; of course he could not be bound by anything that transpired on that occasion. It was not admissible as tending to show what the parties intended by the terms used in the contract, as it does not appear that either party knew anything about it, neither was it admissible as tending to show how the words were generally used, for it does not appear that anything was said there upon that subject. The only question was, what the words " Derby Line " would mean when inserted in a contract like the present, whether they would mean the same as " Derby Line village," or not; some thought they would, others thought they would not. Neither was it admissible as tending to contradict the testimony of witnesses who were present at the meeting, and who also testified that they had never heard the words " Derby Line " used except as referring to the village. Indeed, it does not appear from the case to have been offered for any such purpose, but if it had been, it does not appear that the words " Derby Line " were used on that occasion as referring to the town line. The simple question discussed then was, whether these words might or might

not be so construed, and for aught that appears, the question was for the first time raised on that occasion.

The evidence should have been rejected. The court however charged the jury, that this evidence must " have no effect in this case, unless the facts were known, and assented to by the defendant."

This raises the question whether it is competent for the county court to admit improper evidence, and then in the charge to correct the error as far as practicable, by withdrawing it and directing the jury not to consider it in making up their verdict.

That the county court must have a large discretion in regard to the manner in which trials shall be conducted before juries, must be conceded. For the county court to exclude from the jury all evidence that is inadmissible, is exceedingly difficult if not impossible. Evidence is every day offered in the county court, which at the time it is offered and standing alone, is clearly inadmissible. Indeed a large part of the testimony offered in court standing alone, could have no effect; it is only when taken in connection with other evidence that it has any weight. When such testimony is offered, accompanied with the statement of the counsel offering it, that he in good faith intends to connect it with other testimony, which when introduced will make the offered testimony admissible, the court must receive it, for in many cases, if such other testimony is offered first, it will be liable to the same objection, neither being admissible alone, but together, both are so. If however it turns out that after one part is put into the case, the attorney finds that he is unable to prove the other, there is no other way in which the court can correct the error, except to instruct the jury to disregard it. So when evidence gets into a case through inadvertence, or where, as sometimes happens, when all the evidence is in on both sides, the case assumes a form that is unexpected by both parties, and that renders more or less of the evidence immaterial, the court must regulate the matter by their charge.

In jury trials all will concede that the introduction of inadmissible evidence is an evil and calculated to do mischief, still, as we have seen, it is one that under the best administration of justice, cannot always be avoided, yet as it is an evil, it is clearly the

duty of the court conducting the trial to avoid it by excluding such evidence whenever it can be seen that it ought to be done. The evil must be tolerated so far as it cannot reasonably be avoided, beyond that it should not be. When inadmissible testimony is introduced into a case, it is taken by the jury and weighed by them with the other testimony, it is commented upon by counsel, and before the charge is given them, their minds (very probably) are made up on the very point upon which this testimony bears. Such being the case, when the court tell them this testimony must not be allowed to have any effect in forming their opinion, will they necessarily change their opinion, even though without this evidence they might have formed a different one? Will they be able to analyze the operation of their own minds, so as to know precisely how much influence this evidence had upon them, or will they take the trouble to do it if they *are* able? Will they not rather give up the evidence as directed by the court, and retain and act upon the opinion?

The introduction of this kind of evidence with the intent to withdraw it, so that no harm may ensue, is an experiment, the result of which the court can never certainly know.

We think that in all cases where testimony is offered that in the then present aspect of the case is inadmissible, unaccompanied with any assertion on the part of the attorney offering it, that he intends and expects to introduce other evidence, which when in will make such testimony admissible, the testimony, if objected to, should be rejected, and to admit it is an error that is not cured by the court's directing the jury in their charge to lay it out of the case. If in the further progress of the trial, the case assumes a position that renders the rejected testimony admissible, the evidence can then be introduced, so that no proper testimony is excluded and no improper testimony received.

The case of *Northfield* v. *Plymouth*, 20 Vt. 582, is not at variance with this position. In that case an entire deposition was objected to, and the court admitted it. In the supreme court it was found that there was some irrelevant matter in it; the court refused to grant a new trial for that reason. They say if there is time it would be better to determine in advance, even on a *general* objection, what was inadmissible; on a specific objection it

would ordinarily be done. The case was put mainly upon the ground that the general scope of the testimony was admissible, and no specific objection pointed out, and that the jury were correctly instructed in relation to it. But the court say that when the general scope of the testimony is inadmissible it is highly proper it should be stopped in the outset.

We think also that the testimony as to the character and feasibility of the middle and eastern routes, as compared with the one adopted, was wholly inadmissible in any aspect in which the case was presented.

It was not admissible to show how the parties understood the contract. It might have been admissible for this purpose if the several routes had been surveyed, and it had been found impossible to construct a road to Derby Line Village, as in that event, the probability would be that the company would not take subscriptions conditioned that they should construct a road to a point to which they knew they could not go, but no such fact existed, so that it was not admissible for any such purpose.

But it is said that this testimony was admissible to show that the plaintiff did not adopt the route to the village, for the reason that the route which they did adopt was so much preferable to the others, that, although it took the road three and one-half miles from the village, their duty to the public and the stockholders required the directors to adopt it. All this may be true; still if the contract was that the road should be put under contract to Derby Line Village, and the road which they put under contract was not a road to that point, within the fair and reasonable meaning of such contract, so as to be a compliance with the condition, it is certainly no answer to say, when this failure is set up as a defence, " we did not run our road there because it was better for us and the public to go elsewhere, and our duty required us to do so." This might be a good answer for the directors to the company or the public, but it is no answer to this defence. If such was the contract it would be no answer to this defence, if it was physically impossible to construct a road any nearer to the village. If the plaintiffs fail to comply with the condition, it is done at the sacrifice of all the subscriptions that were obtained on the strength of these conditions. Consequently all this evidence as to the difficulty    r

expense of complying with this condition is immaterial as it furnishes no excuse for not doing so. On the other hand, if the point to which the road was run was a compliance with the conditions, then this evidence was immaterial.

Whether the condition was performed, or not, depended upon the distance the road run from the village, and not upon the ease or difficulty of getting there.

When this evidence was put into the case, and made to occupy a conspicuous position, and the jury required to pass upon it by their verdict, it is easy to see that it might have had an important bearing in the minds of the jury in determining the defendant's liability.

The defendant claimed and requested the court to charge the jury that if the plaintiffs' agent, who obtained the defendant's subscription, represented that the route intended by the written condition was the one terminating at Derby Line Village, and the defendant acted upon such understanding, the plaintiffs were bound by that understanding, whether occasioned fraudulently or not.

We think the defendant was entitled to a charge substantially according to this request, especially as the case hinges upon this very point of how the parties understood the words "Derby Line" when the contract was executed.

On examining the charge it is apparent the idea embodied in this request, was in the mind of the judge, and it may be extracted from the charge, still it is so connected with the idea of fraud on the part of the plaintiffs' agent in procuring the subscription, that the jury may have been misled; this idea does not seem to be distinctly enunciated, disconnected from the idea of fraud, and we think it quite probable that from the charge, and all the evidence, the jury took to their room the idea that if, at the time the defendant signed the paper, the plaintiffs' agent represented to him that the words "Derby Line," as used in the contract, referred to the village, the agent in so doing acting in good faith, he and the plaintiffs then intending to have the road run to that point, and they afterwards ran the road as near to the village as they could, in justice to the public and the stockholders, in consequence of the difficulties and obstructions in the other routes, in that event the defendant ought to pay the subscription.

52

It would seem on carefully examining this charge that the judge below, prompted by that sense of justice which pervades his whole character, in his endeavors to present the case with perfect fairness and impartiality, lost sight for the moment of another important consideration, namely, the necessity of presenting the point upon which the case really turns in all its aspects, so as to make it perfectly intelligible to the jury.

We think the defendant was entitled to a more distinct and explicit charge upon this point, to which the attention of the court was directed by the request.

Other points were raised upon the argument, but under the view we have taken of this case, it is not necessary we should pass upon them.

Judgment of the county court reversed and the case remanded.