## STATE *v.* HOPKINS.

*Criminal Law. Evidence. Opinion. Practice. Handwriting. Expert. Examination of Witness. Gen. Sts. c.* 30, *s.* 85.

On trial on indictment for forging the signature on a bill of exchange, it appeared that on the day when the forgery was alleged to have been committed, G., whose signature was alleged to have been forged, met the respondent, who was then one of a firm of insurance agents, to settle with him a loss under a policy of insurance in which G. was the assured, issued to him through the respondent and his partner. G. testified that when they were met, respondent said he had forgótten the sum estimated to be due, and asked him to give him a memorandum thereof, with his signature thereon in full, which he did, the respondent saying that the company would send a check, and that he would send it to G. as soon as it came. The respondent testified that instead thereof he then made a draft on the company for the amount of the loss, payable to G., and that G. then wrote the signature in question on the back thereof. The state, to corroborate the testimony of G., offered three postal cards afterwards written by G. to respondent's firm, asking if the check had come. Respondent testified that he left home on the day of the date of the last of said cards, and subsequently left the state, and that he had been sick and absent from his office for some time before that, and objected to the admission of the cards in evidence, for that he was out of the state when they were taken from the files of his firm, and for that it did not appear that he had ever seen them. There was evidence tending to show that respondent saw the first card. *Held,* admissible, to show that the conduct of G. at the time he wrote the cards was consistent with his testimony, and that their admissibility was not affected by the question of whether respondent had seen them or not.

The state, to fix the time when G's pecuniary interest in the matter in controversy ceased, was allowed to show that the insurance company on which the draft in question was drawn, " became convinced as early as " a certain day named, that the signature in question was forged, and offered to pay the amount of his loss, and did pay him some months afterwards. *Held,* erroneous, for that it was virtually admitting in evidence the opinion of the insurance company as to the genuineness of the signature.

When evidence is offered which, standing alone, is not admissible, and is unaccompanied 'by any claim that evidence will be introduced having such a relation to it as to make it admissible, it is error to admit it, and the error cannot be cured by instructing the jury to disregard it.

The state offered and was allowed to introduce in evidence as samples of handwriting, checks drawn by G. on the bank where he kept deposit during a period beginning several months before and 'ending several months after the time of the alleged forgery. *Held,* that as it did not appear that the checks or any of them were made at a time when G. had an interest to establish the fact of the forgery, they were admissible for comparison.

The state introduced a witness who testified from his knowledge of G's handwriting that he was of opinion that the signature in question was forged. On cross-examination, a signature that had been used in the trial, and was acknowledged to be genu-

State *v.* Hopkins.

ine, was shown to the witness, and he was asked to point out the difference between that signature and the signature in question. The testimony was excluded, for that the witness was not an expert. *Held*, erroneous.

When new matter is called out on cross-examination, the witness, as to such matter, is the witness of the party who calls it out, and may be cross-examined as such.

The court having ordered that the witnesses for the state be examined separately and apart from each other, the state, to corroborate the testimony of one of its own witnesses, offered the testimony of the sheriff of the county, who had remained in the court room ; and the testimony was received. *Held*, that the statute providing for such separate examination could not have intended the exclusion of the necessary officers of the court ; that its literal enforcement must be to some extent discretionary with the court ; and that the judgment would not be reversed for the exercise of that discretion, unless some right of the respondent was thereby prejudiced.

The state, to show that respondent had knowledge of the sum to be paid G. when he went to meet him on the day when the forgery was alleged to have been committed, introduced respondent's then partner, with a telegram stating the sum, which purported to have been sent by G. to respondent's firm in answer to a telegram from them to him, on the third day before the day of that meeting, and received at the telegraph office in the town where respondent and his partner resided at 11:47 o'clock in the forenoon ; and offered to show by him that respondent left home at 9 o'clock, as witness thought, on the morning of the day the telegram purported to have been received, and did not return until 11 o'clock on the morning of the day of said meeting ; that the witness was accustomed, in respondent's absence, to put letters and telegrams relating to money matters on respondent's table, and that respondent was accustomed to examine them on his return. The witness was allowed to testify, and the telegram to be read. *Held*, no error.

G. was also produced with an uncertified copy of a telegram purporting to have been sent to him on the same day by respondent's firm, asking what that sum was, and witness testified that it was a true copy. It appeared that the original telegram had been destroyed by the telegraph company. The telegram was allowed to be read. *Held*, no error.

Guilt of a crime is not to be inferred from the fact that the accused has ability to commit it. Thus, the state offered testimony tending to show that respondent was skilled in the imitation of the peculiarities of signatures, and the testimony was admitted. *Held*, that as it did not appear that respondent had first introduced evidence tending to show that he had not capacity to commit the act alleged, the evidence was inadmissible.

INDICTMENT in two counts. The first count alleged that on August 1, 1876, the respondent forged the name of Charles H. Green on a bill of exchange for the sum of $541.10, payable to said Green, on the Fire Association of Philadelphia. The second count alleged that he altered and put off said bill with the name of said Green so forged upon it. Plea, not guilty, and trial by jury, June Term, 1877, Caledonia County, Ross, J., presiding.

The utterance of said bill was admitted, and the only question was whether the signature of said Green thereto was genuine. It appeared that at the time of the alleged forgery, the respond-

ent was carrying on a general insurance business at St. Johnsbury with N. P. Bowman, under the name of Bowman & Hopkins; that on March 29, 1876, Charles H. Green, of Barton, obtained through them a policy of insurance upon his property in the Fire Association of Philadelphia, for which they were agents; that on July 18, 1876, said property was burned, and that in a day or two thereafter James U. Taintor, a special agent of the Phœnix Insurance Company, in which said property was also insured, made proof of loss for his own company, and by the request of Bowman & Hopkins, made an estimate of the loss to be paid by said association, which was at once sent to Green to be signed, and then forwarded by the respondent to said association. Taintor's estimate of the amount to be paid by said association was $511.41. It appeared that said association wrote a letter to Bowman & Hopkins on July 26, 1876, giving them authority to make a draft upon said association, payable to Green, to pay said loss. The letter did not state the amount to be paid Green; and it did not appear upon what day it was received by Bowman & Hopkins; but it appeared that it had been received on August 1, 1876. It appeared that at the request of Green, made either by letter or word sent, the respondent and Green met at the depot in St. Johnsbury on the arrival of the 3.20 afternoon up express train, on August 1, 1876, for the purpose of settling the loss; and that Green came and went upon that train, which stopped at the depot on that day seven minutes.

The respondent claimed that at the time Taintor estimated Green's loss to be paid by said association, no memorandum of the amount was retained by Bowman & Hopkins, and that when he met Green at the depot on August 1, he did not remember the exact amount, and asked Green what it was, and that Green told him it was $541.10; that the question then arose whether Green was to have that sum with or without discount, as the company had sixty days on all losses, if it so elected; that Green could not tell, and that the respondent suggested that a draft be made out for the amount Green stated, payable to Green, and that Green indorse it, and the respondent draw on the association, and at the same time write a letter of explanation, and, when the association

answered, the respondent was to send Bowman & Hopkins's check to Green for the amount allowed by said association ; and that accordingly the draft was made in the baggage room in the depot, and then and there indorsed by Green. It appeared that the body of the draft, and Green's indorsement on the back, were in ink, and of the kind used in the baggage room at that time ; and that the respondent wrote an explanatory letter to said association on the same day. The respondent claimed, and there was no evidence to the contrary, that he did not receive any reply to that letter, and that that occasioned the delay in paying Green.

Green claimed that he met respondent at the depot at the time and for the purpose named, and asked him when he could have his money, as he wanted it badly ; that respondent told him he did not know the exact amount ; that he told respondent it was $511.41 ; that respondent asked him what he would discount for the money ; that he told respondent seven per cent., the same as he did to the Phœnix ; that respondent wanted him to put the amount down, so that he could send it when he got to his office, and said that the association would send a check, and that when it came he would send it to him ; that the respondent gave him a piece of paper resembling a half sheet of note paper, when he put down the amount in figures on the paper, in pencil, on the corner board of the depot ; that the respondent told him to write his name under the figures in full, so that when he got to his office he would know what the figures meant ; and that he thereupon wrote his name, with a pencil, as requested, and the respondent took the paper, saying the check would be along by the next Friday.

It appeared that the respondent presented the draft at the Merchants' National Bank of St. Johnsbury for discount a little before four o'clock on August 1st; that the draft was discounted, and the money used by the respondent ; and that the respondent never paid the money so obtained to said association nor to Green.

The respondent testified that he was taken sick the 6th or 7th of September, 1876, and was not again in his office to transact business ; that he went away from St. Johnsbury by the advice of his physician and others, on September 26, and subsequently went

to Canada, and was not again in St. Johnsbury until January, 1877, when he was brought back on process in this prosecution.

The state offered in evidence three postal cards written by Green, directed to Bowman & Hopkins, and mailed ; one dated August 11, one not dated, but written some time after August 11 and before September 26, Green testified, and one dated September 26, 1876. These were taken from the files of Bowman & Hopkins by Green some time in November, 1876, each making the inquiry if that check had come ; and said cards were offered by the state, to show how Green understood the transaction before any trouble arose. There was testimony tending to show that the respondent saw the first one or two of said cards, but not the one of September 26, 1876. The respondent objected to the admission of said cards, on the ground that he was out of the state and not present when they were taken from the files, and for that there was no evidence that the respondent ever saw them ; but they were admitted ; to which respondent excepted.

The state then offered to show that said association became convinced that the signature of Green on said bill was a forgery as early as October 5, 1876, and offered to pay Green his loss, to which the respondent objected. On cross-examination of Green the respondent's counsel called out the fact that the state's attorney, as attorney for said association, paid Green the amount of his loss some time in February, 1877, after this prosecution was commenced. The evidence was admitted, to which respondent excepted. This testimony was offered, as stated by the state's attorney, for the sole purpose of fixing the date when Green's pecuniary interest in the matter in controversy ceased, and was admitted for that purpose alone ; and the court told the jury that it should be considered for no other purpose.

The state introduced Hiram K. Dewey, cashier of Barton National Bank, where Green had done business, as a witness on the genuineness of Green's signature on the bill. The witness produced all of the checks drawn on the bank by Green during the time he did business there, from July, 1876, to May, 1877, as showing samples of Green's handwriting in business transactions. To their admission the respondent objected, but they were admit-

ted ; to which the respondent excepted—especially to the admission of the checks for the month of May.

The state also introduced Charles Calderwood as a witness on the genuineness of Green's signature on the bill. The witness had never seen Green write, but had received business letters from him, on the average of one per month since the spring of 1876, letters that had been acted on by the parties in ordinary business transactions. The witness testified, against respondent's objection, that judging from his knowledge of Green's handwriting, the signature on the bill was a forgery. To the admission of that testimony respondent excepted. The witness was then shown by respondent's counsel a signature, that had been shown to be genuine, and had been used on the trial and was in the case, and asked whether it was genuine, and witness said he should say it was Green's handwriting. The witness was then asked to point out the difference between that signature and the signature on the bill ; to which the state objected, for that the witness was not offered as an expert; and the court sustained the objection ; to which the respondent excepted.

The respondent introduced George May as an expert, who was shown Green's signature on the bill and certain acknowledged signatures of Green's on certificates of deposit in Lyndon National Bank, and who gave his opinion that the signature on the bill was genuine. On cross-examination the witness was examined on matter not called out in the direct examination. On re-examination the respondent's counsel proposed to ask leading questions on such new matter; to which the state objected, for that May was the respondent's witness. The court sustained the objection, and ruled as matter of law and not of discretion, that a party has not the right on re-examination, to put leading questions to a witness produced by him, on new matter called out on cross-examination ; to which the respondent excepted.

The state introduced as a witness Carlos B. Drew, to corroborate Green as to what took place at the depot on August 1st, between Green and the respondent. On cross-examination the witness stated on inquiry, that he first told what he knew about the case in Weeks's store in Lyndon ; that there were several

there, and among others, William H. Preston, and a son of Weeks.

Drew's credibility as a witness was attacked by the respondent on cross-examination. Subsequently the state offered Preston as a witness to corroborate Drew. The respondent objected to the witness' testifying, for the reason that on the opening of the case the respondent requested and the court ordered that all witnesses for the state be examined separate and apart, and that Preston remained in the room and heard the testimony of Drew. The court overruled the objection, and admitted the testimony, on the statement of the counsel for the state that they did not know that Preston could be a witness until Drew had testified, and because the witness was sheriff of the county ; to which the respondent excepted.

The state, for the purpose of showing that the respondent knew the sum to be paid Green when he went to the depot to meet him on August 1, introduced N. P. Bowman, the then partner of the respondent, with a telegram, stating the amount of Taintor's estimate to be $511.41, purporting to have been sent to Bowman & Hopkins by Green, on July 29, 1876, and received at the St. Johnsbury telegraph office at 11:47 A. M., in reply to a telegram of the same date from Bowman & Hopkins. The witness testified that the respondent left St. Johnsbury for New Hampshire on July 29th, and, he thought, on the 9 o'clock morning train ; that he did not remember of seeing him in the office that day ; that he did not return until August 1, on the 11 o'clock morning train ; that he thought he received the telegram and laid it on the respondent's table ; that he and the respondent occupied separate tables ; that he could not tell what the respondent did after his return with any mail matter that might have been laid on his table during his absence. The state, the respondent objecting, then inquired of the witness what he was accustomed to do when the respondent was away, with the respondent's private matters, and letters relating to the money matters of the firm, and what the respondent's habit or custom was regarding such on his return ; and the witness stated that the respondent had his private table, and anything that came for him, or any letters or telegrams relating

to money matters, he laid on his table, and the respondent used to examine them when he came in in the morning. The court also allowed the telegram to be read, against the respondent's objection. To the admission of the testimony so objected to, and to the reading of the telegram, the respondent excepted.

The respondent testified on cross-examination that he went to New Hampshire on the 3 o'clock afternoon train, July 29 ; that he intended to go on the 9 o'clock morning train, but was unwell, and remained at his house, he thought, but did go in the afternoon ; that he had no recollection of being at the office that day, or of sending or receiving any telegram from Green that day, but would not swear that he was not at the office ; that if he was, he presumed he saw the telegram from Green, if it had been received ; that he had no recollection of seeing the letter of July 26 from said association, before his return on August 1. On this point the state also introduced Green as a witness, with a copy of a telegram purporting to have been sent to him by Bowman & Hopkins on July 29, 1877, and received at the telegraph office at Barton at 9:45 in the morning, asking for Taintor's estimate of the sum to be paid by the association ; and the witness testified that he saw the records at Barten, where the copy was made, and knew it was a true copy. The respondent thereupon objected to the reading of the telegram, for that it was not the original telegram, showing in whose handwriting it was, and for that it was not a certified copy, and for that there was no evidence that the telegram was sent by the respondent, except the testimony of Bowman that he did not send a telegram to Green July 29 ; but it was admitted and read ; to which the respondent excepted. It appeared that the telegraph company had destroyed the original telegram with others, in accordance with its regulations, so that it could not be produced, and that the state's attorney had made all proper effort to secure it.

For the purpose of showing that Bowman was unfriendly to the respondent, the respondent offered to show, against the objection of the state, that the witness, Bowman, upon one occasion, after respondent went away from the state, stood by without remonstrating, and saw respondent's private drawer in the safe

broken open for the purpose of ransacking respondent's private papers. The objection was sustained, and the evidence excluded; to which respondent excepted.

For the purpose of showing the ability of the respondent to imitate handwriting, the state, before resting, introduced Elisha May as a witness, who testified that he went into the respondent's office at one time when the respondent was alone, and that he and respondent got to talking about the peculiarities of signatures, and among others that of one Luke Buzzell; that the respondent then imitated Buzzell's signature, and witness thought it was admirably well done; that the respondent also imitated George S. Shaw's signature, and afterwards showed him Shaw's genuine signature for comparison with the imitation, and witness thought it was exceedingly well done; that something was also said about Spinner's signature. To the admission of said testimony the respondent excepted.

The respondent requested the court to charge that if it was finally settled that Green indorsed the bill, then the association could recover the insurance money of Green, so that Green was as much interested to make out a forgery as if he had not been paid the money by the association. The only evidence bearing upon this point is detailed in the exceptions. On that point the court charged as follows:

There has been something said about Green's relation to this case, and his interest. The testimony is that The Fire Association has since paid him his money; but that was paid upon his claim that the signature on the back of the draft was a forgery. If that is his signature, he put it there. Then paying this draft and giving it to Hopkins, the insurance company paid their debt, and if Green has obtained money out of the insurance company on the assertion that this is a forgery, and made them believe it, it is quite probable that they might have a cause of action against him to recover the money back. But this is not the question to be considered here, only as bearing upon what interest Green has in this proceeding. I speak of it here because it shows just what his relations to the draft are. Neither is the fact that the insurance company paid this money, becoming satisfied of his truth, to be taken as a substantial fact. It did not come into the case to show that this was a forgery, but came in solely on the question

of interest—whether Green had such an interest as to lead him to state what was false. You are not to weigh that as tending in fact to show that he did forge the draft.

The court did not otherwise comply with the request. To the neglect of the court to charge as requested, and to the charge given, the respondent excepted. Verdict of guilty.

*Walter P. Smith* and *Dickey & Blodgett*, for the respondent.

The postal cards were improperly admitted. They were declarations of Green in his own favor, after the execution of the draft, not in the presence of the respondent, nor within his knowledge, and were no part of the *res gestæ.* *Bank* v. *McMangle*, 69 Penn. St. 156; *Godding* v. *Orcutt*, 44 Vt. 54; *Lewis* v. *Blake*, 10 Bosw. 198; *Fearing* v. *Kimball*, 4 Allen, 125; *Commonwealth* v. *Cooper*, 5 Allen, 495; *Pulsifer* v. *Crowell*, 63 Me. 22; *Capen* v. *Crowell*, 63 Me. 455; *Rex* v. *Plumer*, Russ. &. Ry. 264; *People* v. *Green*, 1 Parker Cr. (N. Y.) 11; *Gaskill* v. *Skene*, 14 Q. B. 664; *Dutton* v. *Woodman*, 9 Cush. 262; *Fenno* v. *Weston*, 31 Vt. 345; *Farlee* v. *Deuton*, 3 C. & P. 103; *Wright* v. *Doe d. Tatham*, 4 Bing. N. C. 489; *Holbrook* v. *Murray*, 20 Vt. 525; *State* v. *Davidson*, 30 Vt. 377; *Erben* v. *Lorillard*, 19 N. Y. 303; *Milbank* v. *Dennistown*, 10 Bosw. 382; *Small* v. *Gitman*, 48 Me. 506; *Bridge* v. *Eggleston*, 14 Mass. 244.

The allowing of the state to show that the association became convinced that the signature was forged, was erroneous. It is alleged that that evidence was introduced for the sole purpose of showing that Green had no interest in the case that would prompt him to falsify. Had the opinion of the association been contrary to what was claimed, Green's interest to testify that the signature was a forgery would have been no greater than in the present case, but the respondent could not have invoked that opinion in his behalf, except as expert testimony in open court. *Anderson* v. *Rome & C. R. R. Co.* 54 N. Y. 334.

The allowing of Dewey to introduce Green's checks was erroneous. Signatures for comparison should have been selected from those made prior to the execution of the draft in question. 1 Greenl. Ev. 576, n.; *Dowe* v. *Wilson*, 10 Moore P. C. 502;

*King* v. *Donahue*, 110 Mass. 155 ; *Cobbett* v. *Kilmunster*, 4 Fost. & F. 490 ; 1 Greenl. Ev. s. 581.

It was erroneous to refuse to allow the respondent to ask Calderwood to point out the difference between the signature on the draft and the signature that he had called Green's handwriting. The objection that the witness was not offered as an expert, was not well taken.   2 Phil. Ev. *598, n., *599, *617, n. ;   1 Whart. Ev. s. 434, and n. 1 ; 447, and n. ;   *State* v. *Ravelin*, 1 D. Chip. 295 ; *Hathon* v. *King*, 8 Mass. 371 ; *Dickman* v. *Barber*, 9 Mass. 102 ; *Gardner* v. *Gardner*, 34 N. Y. 155, 190 ; *Ramole* v. *Pryon*, 7 S. & R. 90 ; *Sexton* v. *North Bridgewater*, 116 Mass. 200 ; *Dickerson* v. *Fitchburg*, 13 Gray, 546 ; *Hawkins* v. *Fall River*, 119 Mass. 94 ; *Cone* v. *Cush*, 5 Cush. 295 ; *Swan* v. *County of Middlesex*, 101 Mass. 173.

The ruling as to the leading questions asked George May was erroneous.   1 Greenl. Ev. ss. 433, 445 ; *Barcham* v. *State*, 38 Texas, 622 ; *Fairchild* v. *Bascom*, 35 Vt. 398 ; *DaLee* v. *Blackburt*, 11 Kan. 190 ; *Phila. & Trenton R. R. Co.* v. *Stimpson*, 14 Pet. 461, 488 ; *Floyd* v. *Bovard*, 6 Watts & S. 75 ; *Pope* v. *Horton*, 4 Mich. 67 ; *Elmaker* v. *Beckley*, 16 S. & R. 76 ; Whart. Ev. s. 529, and cases cited ; *Brown* v. *State*, 28 Ga. 199 ; *Patten* v. *Haws*, 12 Ind. 256 ; *Deavmond* v. *Deavmond*, 12 Ind. 256 ; *Beaulesu* v. *Parsons*, 2 Minn. 37 ; *Stuart* v. *Baker*, 17 Texas, 417.

The court erred in admitting the testimony of Preston.   Neither the fact that he was the sheriff of the county, nor that he was a witness newly developed, made his testimony admissible.   Gen. Sts. c. 30, ss. 29, 85.

It was error to admit Bowman to testify as to his habit when respondent was away, as to respondent's private matters, and money matters of the firm, and the respondent's habit regarding such on his return.

The telegrams should have been excluded.   *Howley* v. *Whipple*, 48 N. H. 487.

The admission of the testimony of Elisha May was erroneous. 1 Am. Crim. Law, 640 ; *People* v. *Corbin*, 56 N. Y. 363 ; *Andrews* v. *Rome R. R. Co.* 54 N. Y. 334 ; *Reed* v. *Spaulding*, 42 N. H. 118.

The court erred in not complying with the request to charge.

*Henry C. Ide*, state's attorney, for the state.

The postal cards written by Green before any controversy arose were admissible, both as specimens of handwriting and to show that in his correspondence with the respondent at the time he understood the transaction at the depot as he now claims it to be. They were in the nature of actual transactions between the parties.

The credibility of Green was assailed on the ground that he had a direct pecuniary interest in the question on trial. To rebut, it was competent for the state to show that he had received his pay. *Ellsworth* v. *Potter*, 41 Vt. 685.

The checks were admissible. *State* v. *Ward*, 39 Vt. 225, 236; *Adams* v. *Field*, 21 Vt. 256; *Keith* v. *Lathrop*, 10 Cush. 453.

The witness Calderwood was competent to testify as to the genuineness of the signature in question. 2 Phil. Ev. *599; Roscoe Cr. Ev. 175; *Tharpe* v. *Gisburne*, 2 C. & P. 21; *Rex*. v. *Slaney*, 5 C. & P. 213.

It was not error to refuse to allow respondent's counsel to cross-examine George May on his re-examination. It does not appear that the matter on which it was proposed to cross-examine him was material. *Sampson* v. *Warner*, 48 Vt. 247; *Beard* v. *Murphy*, 37 Vt. 99. The matter of leading questions at any stage of the examination, is so far a matter of discretion that no legal exception will lie to any ruling thereupon. 2 Phil. Ev. 892, *et. seq.*; 1 Greenl. Ev. s. 447; *Sheldon* v. *Wood*, 2 Bosw. 267. Besides, the ruling was correct. The respondent, by putting May on the stand, vouched for him. That avouchment continued through the examination, unless the court found as a fact that the witness was adverse. *Beal* v. *Nichols*, 2 Gray, 262; *Moody* v. *Rowell*, 17 Pick. 498; *Commonwealth* v. *Hudson*, 11 Gray, 64; *Varrick* v. *Jackson*, 2 Wend. 166; *Gregory* v. *Nesbitt*, 5 Dana, 419; *Hunt* v. *Fish*, 4 Barb. 324; *Fairly* v. *Fairly*, 38 Miss. 280; 2 Phil. Ev. 889, 899, 908; 1 Greenl. Ev. s. 447.

Preston was rightly allowed to testify. He was sheriff of the county, and an officer of the court. The rule does not mean that

the presiding judge or other officer of the court shall be excluded, if to be called as a witness. Nor does the statute deprive a party of a witness who may accidentally have remained in the room while other witnesses were testifying. In such cases it is entirely in the discretion of the court to allow the witness to testify, and to the exercise of that discretion no exception lies. *Montgomery* v. *State*, 40 Ala. 684; *State* v. *Fitzsimmons*, 30 Miss. 236; 1 Greenl. Ev. s. 432, and n.

Bowman testified that he *thought* he received the telegram from Green and left it on Hopkins's table. To render that more probable, and to bring knowledge of the telegram home to the respondent, it was proper to show the usual course of business in such matters between the partners.

There was evidence tending to show that the respondent received and read the telegram from Green on or before August 1. It was therefore proper to read it to the jury, with proper instructions as to its bearing, in case they should find he had never received it.

The original telegram to Green had been destroyed. Secondary evidence was therefore proper.

The testimony of Elisha May was properly admitted. The main defence was that the signature in question so nearly resembled Green's that it must be genuine. To rebut, it was competent to show that respondent had great skill in counterfeiting signatures.

The opinion of the court was delivered by

ROYCE, J. The respondent was tried upon an indictment charging him in the first count with having, on the first day of August, 1876, forged and counterfeited the name of Charles H. Green upon a bill of exchange for the sum of $541.10 payable to said Green, and drawn upon The Fire Association of Philadelphia, and in the second count with having uttered and put off the same bill of exchange with the name of said Green so forged and counterfeited upon it. The utterance and putting off of said bill of exchange were admitted, and the only question in the case was, whether the signature of Charles H. Green upon it was genuine. The first question presented by the exceptions is as to the admis-

sibility as evidence of certain postal cards written by Green and addressed to the firm of Bowman & Hopkins, of which firm the respondent was then a member, and received by them between the eleventh day of August and the twenty-sixth of September, 1876, making inquiries if that check had come. That evidence had no tendency to prove the *corpus delicti*, and the only use that could properly be made of it was, to show that the conduct of Green at the time he wrote the cards was consistent with the evidence he gave upon the trial. It would have been admissible for Green, after having testified that the respondent was to procure a check for him, to have testified that he made inquiries for the check; and if the inquiries were made in writing, the writings would be the best and most satisfactory evidence of the fact. And as affecting the question of their admissibility as evidence, it would be immaterial whether the respondent ever saw them or not.. It does not appear affirmatively what use the jury were directed to make of them; but, in the absence of any statement in the exceptions upon the subject, the presumption is that the jury were properly instructed as to their use.

The state was permitted to show that The Fire Association *became convinced* as early as October 5th, 1876, that the name of Green upon the back of the draft was a forgery, and offered to pay him his loss, and did pay him some time in February, 1877. This evidence was offered, as stated by the state's attorney, for the sole purpose of fixing the date when Green's pecuniary interest in the matter in controversy ceased, and was admitted for that purpose alone. Without considering the question as to whether the evidence had a legal tendency to show that Green's pecuniary interest in the subject-matter was determined by the payment made to him by The Fire Association, the purpose of the state as stated in the offer would have been attained by limiting the inquiry to the fact that payment had been made to Green by The Fire Association before he was called upon to testify. But as the offer was made and the question permitted to be put by the court, the conviction of The Fire Association that the signature of Green upon the draft was a forgery, was admitted in evidence. It was, in substance getting the opinion of The Fire Association upon the

42

question of the genuineness of Green's signature into the case as evidence. The facts stated in the exceptions do not disclose any reason that would justify the admission of the convictions or opinions of The Fire Association upon that question as evidence. The evidence, then, having been erroneously admitted, was the error cured by the use the court instructed the jury they were to make of it? The court instructed the jury that it was to be considered for the purpose indicated by the offer, and for no other purpose ; thus virtually saying to the jury that they were to consider the evidence which had been given of the conviction of The Fire Association that the signature of Green upon the draft was a forgery, as bearing upon the date when his pecuniary interest in the matter ceased, and not upon the question of the genuineness of Green's signature. It oftentimes happens in the course of a trial that evidence which standing alone would not be admissible, is admitted upon the claim made that other evidence will be introduced bearing such relation to the evidence offered as to make it admissible; in other words, that the evidence offered is one link in a chain of evidence, and that the other links will be supplied. And in such a case, if the promised evidence is not supplied, it is the duty of the court to instruct the jury that they are not to consider the evidence admitted. But where evidence is offered which standing alone is not admissible, unaccompanied by any claim that evidence will be introduced having such relation to it as to make it admissible, it is error to admit it, and the error cannot be cured by instructing the jury to disregard it. *Conn. & Pass. Railroad Company* v. *Baxter*, 32 Vt. 805 ; *Sterling* v. *Sterling*, 41 Vt. 80. The wisdom and necessity of this rule for the protection of parties accused of crime must be apparent. The question of guilt or innocence is not to be determined by the convictions or opinions of witnesses who are not entitled by law to give them in evidence ; and where such convictions or opinions are in evidence, it is impossible to forecast what influence they may have upon a jury, notwithstanding the efforts of the court to prevent it. Hence, we think it was error to admit the evidence that The Fire Association had become convinced that the name of Green upon the draft was a forgery.

The exception taken to the admission of the checks made by Green which had passed through the Barton National Bank from July, 1876, to May, 1877, as showing samples of his handwriting, presents the question as to how far his genuine handwriting was admissible as tending to show by comparison that his signature upon the draft was a forgery. The checks were clearly admissible for the purpose for which they were offered, unless they, or some of them, were made at a time when Green had an interest in establishing the fact that his signature upon the draft was a forgery. As the case is made up, it does not appear that he had any such interest, and there was no error in admitting them.

The state introduced Charles Calderwood as a witness, who testified, from his knowledge of the handwriting of Green, that in his opinion the signature upon the draft was a forgery. In his cross-examination the witness was shown a signature of Green's which had been used upon the trial, and which was acknowledged to be genuine, and was asked to point out the difference between that signature and the signature of Green upon the draft. Upon objection being made by the state, the court ruled that the question was inadmissible, upon the ground that the witness was not an expert. That ruling we think was erroneous. The weight to be given to the opinion of a witness who bases his opinion upon familiarity with handwriting, depends largely upon the extent of his familiarity ; and for the purpose of testing that and his ability to distinguish between a signature that is claimed to be forged and one that has been used upon the trial and is acknowledged to be genuine, it is the right of the party accused of committing the forgery to inquire of the witness what difference there is between the two signatures.

The exception to the refusal of the court to permit the respondent to put leading questions to a witness introduced by him upon re-examination, upon new matter called out upon his cross-examination, was well taken. The rule upon the subject is, that where new matter is called out upon cross-examination, the witness as to such new matter is regarded as the witness of the party who calls it out, and he is subject to the same rules as far as the right of cross-examination is concerned as he would be if the party

calling out such new matter had first improved the witness. If the court had put its refusal upon the ground of discretion, a different rule might, and probably would, prevail.

It was not error, under the facts detailed, to admit the witness Preston to testify. The statute under which it is claimed he should have been excluded, must be reasonably construed, and to a certain extent it must be discretionary with the court whether to enforce it according to the letter or not. It cannot have been intended that it should be so construed as to exclude the necessary officers of the court; and where the court has exercised its discretion in permitting an officer of the court to testify who had remained in court during the trial, in order to warrant a reversal of the judgment on that account, it should appear that some right of the respondent has thereby been prejudiced.

We discover no error in the admission of the facts testified to by the witness Bowman, or the use of the telegram produced by him, or the copy of the telegram produced by Green, for the purpose for which they were put in and used.

The most important question arises upon the admission of the evidence of the witness May. If the respondent in his defence had introduced evidence tending to show that he did not possess the capacity to commit the crime with which he was charged, it would have been competent for the state to meet such proof by opposing evidence; but as we understand the case, no such evidence was introduced by the respondent, and the witness was permitted to testify to the ability of the respondent to imitate or counterfeit the signatures of other parties. The guilt or innocence of a party charged with crime is not to be determined upon any such theory of the law of evidence. No inference of guilt can be established by showing that the party charged had the ability to commit the crime. Proof that the party had previously committed other crimes similar to the one with which he was charged, would not have been admissible. *People* v. *Corbin*, 56 N. Y. 363; *Reed* v. *Spaulding*, 42 N. H. 118. The general reason given for the rejection of that class of evidence is, that the party charged is not to be prejudiced upon his trial by evidence of his previous character. The commission of crime includes the

ability to commit it; and if evidence of the commission of crime is not admissible as bearing upon the question of guilt, it is difficult to see why evidence of ability alone should be. We think the court erred in admitting the evidence.

The exceptions are sustained, judgment reversed, and cause remanded for a new trial.