# STATE *v.* THOMAS WARD.

*Exclusion of Witness. Exception to Argument. Evidence. Previous Attempt. Motive. Circumstantial Evidence. Conduct of Respondent. Alibi. Joinder of Counts. R. L. ss. 4127, 4128*

1. It is not legal error to appoint as prosecutor in a criminal proceeding an attorney who is acting as counsel in a civil suit against the respondent to recover damages for the acts on which the criminal action is based.

2. The statute permitting the peremptory challenge of jurors by the State in criminal cases is constitutional.

3. The trial court ordered that the witnesses for the State should be examined separately. *Held,* that an attorney of the court, who had been present during the trial, but not engaged in it, might testify in rebuttal to a fact as to which he was the only witness.

4. An exception to the language of counsel either in the opening statement or closing argument, must be taken at the time when such language is used, and an objection made for the first time after the statement or argument is finished, comes too late.

5. No exception lies to the offer of the prosecuting attorney to prove certain facts, where such offer is made in good faith.

6. A witness may state his opinion derived from certain facts, when the facts themselves are incapable of exact and minute description; as in this case, that a horse *appeared* tired, that tracks *appeared* to have been made by a sleigh or an overshoe.

7. Evidence of a previous unsuccessful attempt to commit the same crime for which the respondent is on trial is admissible.

8. The evidence for the prosecution tended to show that the respondent had been criminally intimate with one Olivia Amsden, the foster child of Foster, who owned the building for the burning of which the respondent was indicted, that this intimacy had been broken off by Olivia, and that the respondent was greatly enraged at this ; and it was claimed that the motive of the respondent in committing the crime was to be revenged on Foster for interfering with his relations with Olivia, and to wound her by injuring her foster parent. *Held,* that with regard to this question of motive, (*a*) Foster might testify to the relations existing between himself and Olivia; (*b*) that Olivia might state what Foster had said to her about the respondent, which she afterwards communicated to him; (*c*) that any letters between Olivia and the respondent, tending to show their intimacy, that it was terminated against his will, and his threats towards her, were admissible.

State *v.* Ward.

9. Respondent claimed that Foster burned his own buildings for insurance. In view of this, *Held*, (*a*) that the conduct of Foster at the fire was material; (*b*) also the value of the buildings, but not that of the land.

10. A witness testified that he was at a certain house and heard a team pass the night of the 29th of December, and that one Ryan was with him. Witness, on that and several nights, both before and after, was watching with a sick man at this house. *Held*, that he might be inquired of whether this was the only night that he heard a team pass.

11. The prosecution claimed that the respondent hired a team at St. Johnsbury, drove to the vicinity of Foster's, some twenty miles, left his horse and fired the buildings; that just before leaving his horse he turned from the main road at a sharp angle. *Held*, permissible to show that the same horse, when started in that direction four days afterwards, followed, without guidance, the same road, and made the same turn.

12. Respondent claimed that on the night of the fire he was, at half past nine, at Littleton, N. H. One Lynch testified that about six o'clock one evening he saw a horse in respondent's barn, and the wife of Lynch testified that one evening she saw respondent harnessing a horse about nine o'clock, and that later the horse was gone. *Held*, that they might further state that these matters were afterwards spoken of between them that night.

13. Tracks were found near the fire, which the prosecution claimed were made by an overshoe worn by the respondent. A witness having testified that the winter before he sold the respondent a pair, he may produce an overshoe in court which he swears is of the same size, and it may go to the jury.

14. Any articles used in connection with the commission of the crime or the previous attempt may be exhibited to the jury.

15. A witness may swear to his impression of a fact, although he will not state positively that the fact is so.

16. Where a part of the testimony of a witness upon a former trial is put in evidence for the purpose of impeaching him, the whole of such testimony may be shown.

17. It was not error for the court, in its charge, to say that there was no claim that the fire was an innocent one; that it was the wicked and malicious act of somebody; that it was maliciously set; when the whole case had been tried upon this theory, and the jurors could not have inferred from the language of the court that they could convict without finding the body of the crime.

18. It was no error for the court to say to the jury, in explaining the nature and weight of circumstantial evidence, that many great jurists had pronounced it "of a nature equally satisfactory with positive evidence and less likely to proceed from perjury." If the law laid down by the trial court is correct, it is in no wise material in whose language it is expressed.

19. The fact that the respondent did not satisfactorily show where he was on either the night of the fire or that of the previous attempt, was properly commented upon by the counsel for the prosecution.

State *v.* Ward.

20. The respondent set up an *alibi.* The court instructed the jury that the evidence to prove it must out-weigh the evidence to show the respondent at the place of the crime, and if so established they should acquit. It further instructed the jury that the *alibi* evidence was to be considered with all the other evidence in the case, and if upon the whole there was a reasonable doubt as to the respondent's guilt, he was entitled to an acquittal. *Held,* not contradictory and correct.

21. If it is established beyond all question that a respondent has sought to prove an *alibi* by false and fabricated evidence, that fact will be an admission of guilt, but not conclusive.

22. There is no objection to joining in an indictment counts charging the same act with different intents under R. L. s. 4128 and R. L. s. 4127.

This was an indictment for arson in three counts. Plea not guilty. Trial by jury at the December Term of the Caledonia County Court, 1887, Veazey, J., presiding. Verdict of guilty on the second and third counts. The respondent took numerous exceptions in the course of the trial, of which the following were insisted on in the Supreme Court:

1. The State's Attorney was disqualified to prosecute this indictment by reason of having been employed by the respondent in a behalf which rendered it improper for him to act, and Henry C. Ide was appointed by the court to assist in the prosecution. Mr. Ide was attorney for Foster, the owner of the buildings which were burned, and had begun in his behalf a civil suit against the respondent to recover from him the damage caused by the fire. The respondent insisted that Mr. Ide ought not to be appointed special prosecutor by reason of his connection with Foster as above, but the court overruled this objection, and appointed him as a matter of discretion, and he acted as leading counsel in the preparation and trial of this case.

2. In impaneling the jury the State proposed to excuse one juror without assigning any cause, to which the respondent objected on the ground that the statute giving to the State the right of peremptory challenge was unconstitutional. The court held otherwise, and the juror was excused.

3. The respondent asked that the witnesses for the State should be excluded from the court room, and not examined in the presence of each other. Among the witnesses which it was proposed to improve on the part of the State were Mr. Mont-

gomery, who was by assignment from the court assisting in the prosecution, and Mr. Sulloway, the Sheriff of the county, and in making the order the court, against the exception of the respondent, excepted them from its effect. It was not at that time supposed that Mr. Stafford would be a witness.

4. The opening statement to the jury was made by Mr. Ide. No objection was made to any part of it during its progress, but after it was concluded, the respondent excepted to certain portions of it.

5. In his closing argument to the jury Mr. Ide used the following language : " When one of you is charged with committing a crime, and has it in his power, when you are charged, not by officers of the law, but by your acquaintances and neighbors; when you have it in your power by opening your mouth to those neighbors and acquaintances to clear yourself; when you sit apparently still while those neighbors approach you, and give no sort of explanation or excuse; when you go into the justice trial and call witnesses in your behalf, but fail to call those witnesses you know could testify as to your whereabouts; when you let the matter drag along for about a year and never approach a witness who could tell of your whereabouts for at least a year and a half after the transaction occurred; will you have the hardihood to ask the jury to believe that you are innocent of the crime if you sit still during all the time without the least willingness to explain and clear yourself ?

" I ask you to judge Thomas Ward by your own consciences and see how you would act under these same circumstances."

Immediately upon the conclusion of the foregoing remarks, counsel for the respondent excepted thereto.

There was no affirmative testimony offered or admitted to show that the respondent did not approach persons, after being charged with this crime, in respect to his whereabouts on the nights in question, but upon the evidence as it stood as a whole, there was some ground for inference that he did not, at least until recently, and counsel for the respondent dealt with it in their arguments to the jury, urging that his conduct did not tell against him and was pursuant of a legal right.

6. Mr. Ide on two or three occasions in the examination of witnesses asked a question to which the counsel on the other side objected. Mr. Ide then proceeded to state to the court, but in the presence of the jury, what he expected to show by the question. Counsel for the respondent did not make any objection to the making of the offer before it was begun, or while it was being made, but upon its conclusion excepted to its being made in the presence of the jury.

7. The buildings burned were situated in the town of Walden, about twenty miles from the village of St. Johnsbury, where the respondent resided. The evidence on the part of the State tended to show that during the afternoon before the fire the respondent hired a team of one Clutier in St. Johnsbury, that said team was seen in the respondent's barn in St. Johnsbury about seven or eight o'clock that same evening, and that the respondent returned with it at about four o'clock the following morning. With reference to the condition of the horse when it returned on the morning after the fire, the State was permitted to show that it *appeared* tired.

8. The buildings were burned on the morning of Jan. 27, 1886. On the 29th of the December previous an attempt had been made to burn these buildings. The evidence of the State tended to show that on the evening before this attempt the respondent had hired this same team, and driven with it into the vicinity where the buildings were. The State also claimed that the declarations of the respondent when he returned on the morning of January 27th, as to where he had been during the night, tended to show that he had been to the same place as on the night of the attempt four weeks before. The State was permitted to show in connection with these other circumstances the fact of the previous attempt.

9. The evidence for the prosecution tended to show that the sleigh which the respondent had on the two nights in question was of a peculiar and unusual make in certain respects, so that the track made by it in the snow would differ materially from that of other sleighs in common use in that vicinity. It ap-

peared that on the night of the fire some one had turned around his team on a road but little frequented in the vicinity of the fire, and in so doing had backed his sleigh into the snow which was drifted to a considerable depth beside the road. The snow had retained the impression of the sleigh which was backed into it. Two or three days afterwards the sleigh which the respond-ent had on that night was brought and fitted into the tracks so made. The State was allowed to show this fact, and the exact-ness with which the sleigh fitted.

10. The State claimed that the motive for the commission of this crime on the part of the respondent was to be found in the relations existing between him and one Olivia Amsden. Miss Amsden was the foster child of Foster, and had lived in his family as a member of it from the time she was fifteen until she was nineteen years of age. At that time she had married and gone to live in St. Johnsbury, where she became acquainted with the respondent, between whom and herself an intimacy sprang up. After a time she removed to Manchester, N. H., where she was residing at the date of the fire. The intimacy between the respondent and herself was continued for some time after she went to Manchester, when it was broken off, leaving the respondent greatly incensed. The Fosters had op-posed her connection with the respondent, and remonstrated with her with reference to it. The State claimed that the mo-tive of the respondent was twofold, first in that he hoped to wound Olivia Amsden in her affections for the Fosters, and secondly in his desire to be revenged upon the Fosters them-selves for their interference in his relations with Olivia. In view of this claim Olivia Amsden and Foster were permitted to testify to the affectionate relations between her and his family, and to the fact of their opposition to her intimacy with the re-spondent. Miss Amsden also testified that she had talked with the respondent about her relations with Foster's people, and their dislike for him.

11. Upon the cross-examination of Foster there had been suggestion that the respondent would claim that the fire was set

by Foster himself for the purpose of obtaining the insurance. With a view to repelling any insinuation of this kind counsel for the prosecution proposed to ask the witness on re-direct examination what his conduct at the fire had been, and as to the amount of the insurance, and the property covered by it. When the object of this line of inquiry was stated, the respondent refused to waive the right to so claim, and Foster was allowed to testify that in fighting the fire he was somewhat burned, and was so overcome and prostrated by his exertions as to be unable to work for several days.

12. Foster was also permitted to state in this same connection the value of the property destroyed, the amount of the loss, the amount of the insurance that he received, and that there was no insurance on the cattle and other personal property destroyed, except the hay and straw, and that it was all burned. Upon re-cross examination, after having stated that the entire insurance on his buildings and their contents was $1,700, he was asked how much his place was worth at the time of the fire, buildings and land included, to which the State objected. The respondent claimed that the entire premises were not worth as much as the insurance, but the court limited the inquiry to the value of the buildings ; whereupon the witness was asked what the place would be worth with the buildings gone, which was excluded by the court.

13. One Osgood was improved as a witness by the State, who testified that on the night of December 29th, which was the night of the first attempt, he was watching at one Wilson's, that being on the road between St. Johnsbury and the buildings which were burned, that he heard a team pass going in the direction of Foster's and from St. Johnsbury about twelve o'clock, and that he heard a team driving from the direction of Foster's and towards St. Johnsbury about two o'clock. Osgood had been at Wilson's several nights at about that time, and for the purpose of identifying this as the night of the 29th, he was allowed to testify that this was the night that one Ryan sat up with him, and the only night that he heard a team pass, and that

the passage of this team was the occasion of remark between him and Ryan. He was able to fix from other sources the night that Ryan was there as the 29th.

14.  One Streeter was improved as a witness by the State and in the course of his examination was asked a question to which the respondent objected and excepted, but such exception was not taken until after the question had been fully answered, and in view of the decision of the court it becomes immaterial whether the question would have been objectionable had the exception been taken in season.

15.  It appeared that at some time after Olivia went to New Hampshire the respondent had written a letter to her sister. Having first shown that this letter had been destroyed, the State was permitted to give evidence of its contents. The letter was for the purpose of urging the sister to talk with Olivia, and persuade her if possible to live with him, and saying that she would have done so had it not been for the influence of Foster's people.

16.  After the fire Olivia Amsden had come up from Manchester to St. Johnsbury, where she saw the respondent at the depot, and had a talk with him in reference to the fire. In the course of this conversation she had asked him if he knew that he was suspected of having burned the buildings, and how he happened to have a team on those two nights, and where he was with it. In reply he had said that he hired the team because he wanted it; that the last night it was in the barn part of the time, and that it remained to be proven where it was the rest of the time.

17.  After the intimacy between Olivia and the respondent had been broken off, and while she was at Manchester, the respondent wrote to her several letters and postal cards, in which he referred to their former intimate relations, accused her of unfair treatment towards him, and which contained threats against her, but which did not contain any direct reference to Foster or his family or the fire. These were admitted for the purpose of showing what the relations between Olivia and the respondent had been, and the feelings of the respondent towards her consequent on the breaking off of those relations.

18. The testimony of the State tended to show that in passing from St. Johnsbury to the place of the fire over the usual route, the road several times divided, that one leading to Foster's leaving the other by a sharp turn, and that the Goodenough road left the highway leading to Foster's by a sharp angle also. This Goodenough road was the one on which the sleigh tracks were found, which indicated, as the State claimed, that the respondent had turned around on the night of the fire. The theory of the prosecution was that the respondent had left the direct road, driven a short distance up this Goodenough road, turned around, left his team and proceeded on foot either by the highway or some other route. As tending to show this the State was permitted to show that two days after the fire this same horse which the respondent had driven the night of the fire was taken some distance from St. Johnsbury in the direction of Foster's, and then allowed to choose its own course, and that it did, without any guidance, make all the turns leading to Foster's until it came to the Goodenough road, when instead of keeping on the straight road it turned up the hill in the direction of the place where the sleigh tracks were found. The State was also permitted to show that this horse had not been into this vicinity for a long time, if ever at all, unless when driven by the respondent on the two nights in question ; and that it was the habit of the horse to follow a road over which it had been recently, or stop at a place where it had lately stopped.

19. The witness Clutier was allowed against the exception of the respondent to answer the following question :

Q. Whether you testified upon this subject of his having the team and what took place then substantially as you have here ?

Ans. I did.

Clutier was the stable keeper who had let the respondent the team on the two nights in question, and the " then " referred to in the question was at the trial before the justice. The question was asked on re-direct examination in view of certain admissions which it was claimed by the respondent that the witness had made in reference to these transactions.

(11)

State *v.* Ward.

20. The nature of this exception sufficiently appears in the opinion of the court.

21. The State produced one Sherrah, who testified that on the night of the fire a team passed him going in the direction of Foster's and from the direction of St. Johnsbury, at about the time of night when it was claimed by the prosecution that the respondent would have been at that place. Two or three days afterwards the team which the respondent had on that night was shown to the witness, and he was allowed to testify on the trial that the team then shown him was the one which passed him on the night of the fire as he thought. Mr. Montgomery was the person who took the team from the stable in St. Johnsbury and exhibited it to Sherrah, and he was allowed to state that on the occasion of so exhibiting it, he caused it to be driven along the road at about the same distance from, and under nearly the same conditions that it passed the witness on the night of the fire.

22. It was claimed by the State that the person who set the fire left the highway some distance before reaching the buildings, which were situated a little back from the road, and passed up to them through the field, which was then covered with snow, and after setting the fire, passed back to the highway from the opposite side of the buildings; that the respondent wore a pair of overshoes; and that the tracks were made by an overshoe of the size and shape with those worn by the respondent. As tending to show that the tracks were in fact made by an overshoe one witness for the State was permitted to testify, after describing the tracks, that in his opinion the track, where at one place it passed over a stone wall, was made by an overshoe, and to give his reasons for this opinion.

23. One Drouin testified that he was a boot and shoe dealer in St. Johnsbury, that he had at various times sold the respondent boots and shoes, and that he had the year before the fire sold him a pair of overshoes of a certain size. He exhibited in court an overshoe, which he testified was of the same size as the

one sold the respondent, though of a different make. This overshoe was admitted by the court as a standard with which to compare the measurements taken of the tracks in question.

24. The attempt to fire the buildings on the 29th of December had been made by placing two pieces of beet with a candle stuck in each on a pile of straw in the barn. Near by was found a lard pail, and the theory of the State was that the beets and candles had been brought there in this pail. The evidence of the State tended to show that on the first occasion when the respondent took this team, it being the evening before the attempt, he had with him and put into the sleigh a bundle which would be about the size of this pail.

On the morning after the fire there was found beside the Goodenough road, and near its junction with the road leading to Foster's, a copy of the Manchester Daily Mirror and American. The evidence of the prosecution tended to show that no papers of that kind were taken in that vicinity and that the respondent had received from Olivia, and had in his possession such papers. Also that the paper was dropped where it was found on the night of the fire, and not previously.

All these articles, together with the sleigh, were admitted in evidence.

25. The evidence of the State tended to show that on the evening of the fire he took this team from his stable in St. Johnsbury, where he had put it after taking it from the livery stable in the afternoon, at about nine o'clock, and drove away with it. The respondent claimed and introduced evidence tending to show that on that same evening at that same hour he was in the village of Littleton, N. H., which is some twenty miles from St. Johnsbury. The State produced one Smith, who testified that on the evening in question he had seen this sleigh in front of the respondent's barn. For the purpose of identifying the sleigh he had been taken up to the stable of Clutier, where was this one with several others, and had picked out this sleigh as the one which he saw on that evening. The court permitted this fact to be shown.

State *v.* Ward.

26. The Sheriff Sulloway was allowed to testify that he had taken the witness Smith to the stable of Clutier, and that he did there select the sleigh in question without any suggestion from any source.

27. The State claimed that when the respondent left his team on the Goodenough road he secured it by means of a hitching weight, and the witness Sulloway was permitted to testify that it was his impression that he had seen the respondent using such a weight.

28. Immediately after the fire, Mr. Montgomery, who was then State's Attorney, began an investigation, in the course of which he talked with many of the witnesses who testified on the trial with reference to the matters about which they finally testified. Many of these witnesses fixed the time of the occurrences to which they testified by the time when they first spoke to Mr. Montgomery about them. With a view to this, Mr. Montgomery was allowed to testify that he went into that vicinity, and talked with these witnesses, and when.

29. The character of this exception sufficiently appears from the opinion of the court.

The respondent excepted to the charge of the court upon the following points:

1. To the statement of the court that there was no claim by respondent that this was an innocent fire.

2. To the Court's assuming that the fire was the willful act of somebody.

3. To the rule laid down by the court as to the law of *alibi*.

4. To the charge upon the subject of the introduction of false evidence of *alibi*, and to the statement that proof of *alibi* must outweigh the proof that the respondent was at the place of the crime when it was committed.

5. To the statement to the jury that many great jurists have pronounced circumstantial evidence the most satisfactory kind of evidence, etc.

6. To the charge that the State has introduced evidence tending to show the respondent guilty.

7. To the charge as to the conduct of the respondent and inference to be drawn by the jury therefrom.

8. To the charge as to the presumption of innocence, when it continues and ceases.

9. To the charge that the respondent may be convicted on both the second and third counts.

" With reference to the first two points of exception as above stated, the counsel for the respondent in their arguments to the jury and the court made no suggestion of any claim contrary to the statements contained in the charge on these points. No written requests were made, but counsel made oral suggestions, which however contained no allusion to a claim of the kind implied. In the early part of the trial some inquiries made of Foster indicated that the claim might be made that Foster set the fire himself, but the evidence brought out was so meagre, and counsel failing to press the claim, the court felt justified in treating it as abandoned, and in presenting the issues to the jury as counsel had done."

The foregoing extract is from the bill of exceptions as certified by the presiding judge.

The charge of the court upon the various points to which exception was taken as above was as follows :

" The first count in the indictment charges in substance that this respondent on the 26th day of January, 1886, set fire to certain buildings, to wit, two barns and one shed, of Mr. Harvey Foster of Walden in this county, adjoining the dwelling house of the said Harvey Foster. It turned out upon proof that these buildings did not literally adjoin the dwelling house. You will remember the evidence showed that there was a space of six or seven feet, if I remember correctly, so that literally there was not an adjoining. And so this count does not apply to the evidence as it finally comes into the case and that count will therefore be dropped out.

The next count charges the same thing, that is, setting fire with intent, etc., to certain buildings, described, without saying that they are adjoining, therefore that count does apply to the tendency of the evidence.

The third count charges the same thing, with the addition that he did this with intent then and there to burn said dwelling house and outbuildings of the said Harvey Foster, etc.

Now if you should find that this respondent is guilty, that he was guilty of setting this fire to those outbuildings, or the barn with this intent, of the fire connecting right through and destroying the dwelling house, then you could find him guilty under this third count as well as the second; so that those are the only three counts in the indictment.

So that if you find him guilty you will be prepared to say in your verdict whether you find him guilty under the second or third count, or under both those counts."

"The State has introduced evidence which, if true, tends to show that the respondent is guilty as charged."

"There is no claim but there was a fire, or the destruction of these buildings, as charged in the indictment, by fire; the buildings of Mr. Harvey Foster, at the time and place charged in the indictment.

There is no claim that this was an innocent fire. Everything in the case points with great force to the fact that somebody purposely, maliciously set the fire that destroyed Foster's barns and other property. The case is relieved from a question that not infrequently arises in arson cases, the question whether the fire was accidental or designed.

We have for a starting point the undisputed fact that this fire was the wicked, malicious act of somebody.

This relieves all necessity of explaining to you the definition of arson."

"The State is unable to produce any witnesses who saw the evil act done. It therefore has had to rely upon other evidence, evidence of another kind, as evidence is classified in legal books. The kind of evidence upon which the State claims a conviction is called circumstantial evidence, as contra-distinguished from another kind, called in the books positive or direct evidence.

As there is apt to be more or less misapprehension as to the legal quality, the force and effect, of these two kinds of evidence, it is my duty to briefly explain them.

Criminals take with them no persons simply to witness the contemplated crime. Crime is usually intended to be secret. The perpetration of crime by any particular person must therefore oftentimes be by circumstantial evidence in order to be established at all.

When a person testifies to the precise fact, of his own knowledge, as by seeing the act done which is charged, it constitutes positive or direct evidence. In this case if some person had been standing by and seen who set fire to Foster's barn, it would be direct evidence. So far as appears there was no such person, and there being no such person known, the crime would have to go unpunished, if positive or direct evidence was the only kind upon which to predicate a conviction. If it were always necessary to have positive evidence many criminal acts committed in a community, destructive of its peace, and subversive of its order and security, would go wholly undetected and unpunished.

If witnesses detail a variety of facts, from no one of which guilt is inferable, but it is from all combined, we have circumstantial evidence. Many great jurists and law writers have pronounced it to be of a nature equally satisfactory with positive evidence, and less likely to proceed from perjury.

No doubt innocent men have been convicted under circumstantial evidence. There are most startling instances of this recorded. But the same is true under direct evidence. Some judges of great experience have expressed the opinion that more innocent persons have been condemned upon the positive testimony of perjured witnesses and witnesses who were mistaken as to the fact of which they testify directly, than upon circumstantial evidence. I express no opinion upon this point, and only mention it as one of the claims proper to be called to your attention, made in respect to circumstantial evidence in authoritative books upon criminal jurisprudence. Each of these modes of proof has its advantages and disadvantages, and it is difficult to decide upon their relative or comparative value."

" Then in the second place they claim to have established an *alibi.* That is that the respondent was at home, twenty miles

from the place of the fire, on the first night, the 29th of December, and was in Littleton, N. H., on the night of the fire.

The ground of this defense is aggressive in its character. The defendant seeks to establish a fact inconsistent with guilt, a fact, which, if established, demonstrates his innocence. It is the simple proposition that a man cannot be in two places miles apart, at the same time. If the defendant establishes that he was in Littleton at the time of the fire, then he establishes that he was not at the place of the fire that night. The same is true as to the former occasion in December.

An *alibi* is a legitimate and proper defense to make, just as much so as any other defense, and if satisfactorily made it is conclusive. Innocent men would and should resort to it, and no doubt it has often been the means of escape under wrongful charges. But it is defense sometimes attempted by contrivance, subornation and perjury. It does not involve a complicated inquiry. Proof of it is measurably simple and direct, therefore persons void of truth may fabricate it with greater hope of success and less fear of punishment than many other kinds of evidence.

Proof of it involves accuracy as to dates, times of day and identity of persons seen, subjects in respect to which honest witnesses oftener mistake than in respect to many other things to which they testify. The direct proof therefore offered to sustain an *alibi* is to be subjected to a rigid scrutiny, because standing by itself it does not attempt to control or rebut the evidence of facts sustaining the charge, but attempts to prove affirmatively another fact inconsistent with it. It is in direct conflict with all the evidence tending to show the guilt of the respondent, because in so far as that tends to show he committed the offense, it tends in the same degree to show he was at the place of the crime when committed. If therefore the proof of the *alibi* does not outweigh the proof that he was at the place when the crime was committed, it is not sufficient. In this conflict of evidence, as before stated, whatever tends to support one theory, tends in the same degree to rebut and overthrow the other, and it is for the jury to decide which is the truth.

But this proof of an *alibi*, even if not sufficient, as against the other evidence, to establish the fact of an *alibi*, does not change the rule that I have before stated, that in order to warrant conviction, you must be satisfied upon all the evidence in the case beyond a reasonable doubt. How has all the evidence in the case, including the *alibi* evidence, giving it, in its bearings in all directions, due consideration and weight, left your minds? A party relying on an *alibi* as a defense must prove it. But the setting it up does not change the presumptions of innocence or the burden of proof on the prosecution as the same has been explained, that the respondent was at the place of the crime and committed it, and therefore not at home at the time of it.

As before stated the evidence of an *alibi* is either true or false. If true it should acquit the respondent. If false, and you are satisfied of it, the introduction of it, and the attempt to procure an acquittal by it, constitutes a circumstance against him. The introduction of false or fabricated evidence in a defense is always regarded as an inferential admission of guilt, although not of a conclusive character. But to be entitled to any force, as it is only circumstantial and collateral to the main issue, it should be established beyond all question, that the party has been guilty of producing false and fabricated evidence. If this is doubtful no weight should be given to it.

"Allusion has been made in the course of the arguments to the conduct of the respondent both before and after being charged with the offense.

In nearly all criminal cases evidence showing the conduct is introduced, not so much to show the act itself, as indicative of a guilty mind. In weighing such evidence the jury should exercise caution and care.

The rule is for the jury to apply honestly their experience, and to draw such inferences as experience warrants in matters of the gravest importance. Counsel have indicated the inferences they draw from Ward's conduct on different occasions, and which they ask you to draw and make. Now apply the above rule. Exercise care. Apply honestly your experience. Remember

the circumstances and situation as shown. Remember this is a matter of the gravest importance. Draw such inferences as experience has taught you are safe and just in matters of such gravity and importance.

All presumptions of law independent of evidence are in favor of innocence, and every person is presumed to be innocent.

Counsel have alluded to this a good deal in the course of their arguments. There is nothing mysterious about it. A man cannot be presumed to have committed a crime without some evidence of it, the presumption is the other way. A man stands indicted, the presumption of his innocence is enough, if no evidence is put in to sustain the charge, he is not called upon to speak at all. But when evidence is put in that is sufficient to convict of guilt, the presumption gives way.

The burden of overcoming this presumption and all evidence of the respondent, and establishing the fact of guilt, is on the State, and this continues throughout the trial, and it is to be established by the measure of proof stated, that is beyond a reasonable doubt."

*Bates & May, L. H. Thompson* and *Harry Blodgett,* for the respondent.

1. Mr. Ide was improperly appointed prosecuting attorney, as it was conceded that he was attorney for Foster in a civil suit then pending against respondent for the same cause of action.

2. It was error for the court to allow peremptory challenges by the State. Respondent had a right to a common law jury under section 10 of Bill of Rights and at common law the State had no right of peremptory challenge; No. 5 Section 10 of the Acts of 1870, which attempts to give the State such right, is unconstitutional and void. *Plimpton* v. *Somerset,* 33 Vt. 283 ; *State* v. *Peterson,* 41 Vt. 518 ; *in re* Kennedy, 55 Vt. 1.

3. R. L. 1711 gives respondent the right to have witnesses against him examined separately, and respondent having availed himself of this privilege, it was error for Mr. Stafford to testify, he not being an officer of the court and not having been excluded with the rest of the State's witnesses.

4. The prosecution had no right, in its opening, to state matters not admissible in evidence. *State* v. *Hannett,* 54 Vt. 89 ; *Rea* v. *Harrington,* 58 Vt. 190 ; *State* v. *Cameron,* 40 Vt. 565 ; *Com.* v. *Scott,* 123 Mass. 239 ; S. C. 25 Amer. Rep. 87 ; *Scripps* v. *Reilley,* 35 Mich. 371 ; 24 Am. Rep. 575 ; *Showalter* v. *State,* 84 Ind. 562 ; *Baker* v. *People,* 105 Ill. 452 ; *Thompson* v. *State,* 21 Texas, Ap. 181 ; *Alexander* v. *State,* 21 Tex. Ap. 407 ; *Sullivan* v. *State,* 66 Ala. 48 ; *People* v. *Dane,* 59 Mich. 550 ; *Brow* v. *State,* 103 Ind. 133 ; *People* v *Millard,* 53 Mich. 63 ; *Stokes* v. *State,* 5 Box. 619 ; S. C. 30 Am. Rep. 448 ; *Com.* v. *McDermott,* 123 Mass. 440 ; S. C. 25 Am. Rep. 448 ; *Com.* v. *Harlow,* 110 Mass. 411 ; *Com.* v. *Maloney,* 113 Mass. 213 ; *Scripps* v. *Reilley,* 38 Mich. 10 ; *Willet* v. *People,* 27 Hun. 469 ; *Angelo* v. *People,* 96 Ill. 209 ; S. C. 36 Am. Rep. 132 ; *Cross* v. *Grant,* 62 N. H.; *Hilliard* v. *Beatty,* 59 N. H. 462 ; *Perkins* v. *Berley,* 6 N. E. Rep. 817, N. H. July 18 ; *Sasse* v. *State,* 32 N. W. Rep. 849.

5. It was error for Mr. Ide to offer, in the hearing of the jury, to prove matters not evidence. It cannot be urged that this error arose from Mr. Ide's inexperience. *Alexander* v. *State,* 21 Tex. Ap. 407 ; *Willet* v. *People,* 27 Hun. 469 ; *Brock* v. *State,* 26 Ala. 104 ; *Scripps* v *Reilley,* 38 Mich. 10.

6. The State was permitted to show by certain witnesses that the horse respondent had Jan. 26th, appeared tired on the morning of Jan. 27th. This evidence was wholly immaterial to the issue and therefore erroneous. *McAdory* v. *State,* 59 Ala. 93.

7. Foster and his son were permitted to testify with reference to an alleged attempt to burn Foster's barn Dec. 29th, 1884. This evidence was improperly admitted, first, because it was too remote, second, because it was an attempt to prove respondent guilty of another and distinct crime, and third, because there was no evidence connecting respondent with such attempt. *State* v. *Hopkins,* 50 Vt. 332 ; *State* v. *Hannett,* 54 Vt. 86-88 ; *State* v. *Davidson,* 30 Vt. 385 ; *People* v. *Sharp,* 107 N. Y. 427 ; *Reed* v. *Spaulding,* 42 N. H. 118 ; *Baker* v.

*People,* 105, Ill. 452 ; *Alexander* v. *State,* 21 Tex. Ap. 406 ; *Wheeler* v. *State,* 23 Tex. Ap. 598 ; *Brock* v. *State,* 26 Ala. 104 ; *People* v. *Corbin,* 56 N. Y. 363 ; *State* v. *Freeman,* 4 Jones (N. C. L.) 5.

8.   It was error for the court to admit evidence and experiments in regard to the sleigh tracks in the Goodenough road, because there was no evidence connecting respondent with such tracks.

9.   Witness Olivia Amsden testified that she had spoken to Mr. Ward about what Foster's people had said about him and about her being with him, and as bearing upon the truth of this testimony, she and the witness Foster were allowed to testify with reference to conversations which passed between Olivia and the Fosters at a time when Ward was not present. This was error. *Houston* v. *Russell.* 52 Vt. 116 ; *Camp* v. *Averill,* 54 Vt. 324 ; *State* v. *Hopkins,* 50 Vt. 330 ; *Huse* v. *Preston,* 51 Vt. 252 ; *State* v. *Celly,* 51 Vt. 291 ; *Baird* v. *Fletcher,* 50 Vt. 607 ; *Com.* v. *Harwood,* 4 Gray 41 ; *People* v. *Beach,* 87 N. Y. 509 ; *Campbell* v. *State,* 8 Tex. Ap. 88–90 ; *People* v. *Cox,* 21 Hun. (N. Y.) 47 ; *Fougue* v. *Burgess,* 71 Mo. 389 ; *State* v. *Davidson,* 30 Vt. 383 ; *Whitney* v. *Houghton,* 125 Mass. 451.

10.   For the purpose of rebutting the claim that Foster fired his own buildings, he was allowed to testify as to being overcome and exhausted and receiving injuries by reason of fighting the fire. A rascal who had fired his own buildings would naturally seek by his own conduct to divert suspicion from himself. This testimony had no tendency to show that Foster did not fire his own buildings, but did have a tendency to prejudice the jury against respondent ; it was therefore improperly admitted.

11.   After the value of the buildings and the amount of insurance thereon had been shown, it was material to show the value of the land as bearing upon the claim of the respondent that Foster fired his own buildings.

12.   The testimony of witness Osgood that he noticed no teams except on second night he was at Wilson's was immaterial, and therefore improperly admitted.

13. It was error for the court to permit witness Streeter to testify about comparing postal cards with writing he had seen respondent write, not produced in court. Before comparison of hand-writing can be made, with a given signature as a standard, the court must pass upon the genuineness of the standard. *Rowell* v. *Fuller*, 59 Vt. 689.

14. The evidence about the conduct of the horse when driven over the road four days after the fire, which it was claimed respondent traveled with same horse on the night of the fire, was too vague and uncertain, and therefore inadmissible. *Strong* v. *Slicer*, 35 Vt. 43 ; *Tower* v. *Rutland*, 56 Vt. 32 ; *Bryant* v. *C. V. R. R.*, 56 Vt. 712 ; *Harris* v. *Howard*, 56 Vt. 696 ; *Com.* v. *Marshall*, 81 Mass. (15 Gray) 202 ; *Thompson* v. *Bowie*, 4 Wall. 463 ; S. C. 18 L. C. P. Co. 423 ; *Morris* v. *East Haven*, 41 Conn. 252 ; *Chase* v. *R. R. Co.*, 77 Me. 62 ; *Jackson* v. *Smith*, 7 Conn. 719 ; *Bank* v. *Shakenan*, 30 Wis. 336.

15. The witness Clutier should have stated what he testified at the justice trial, not that he testified *substantially* the same as in county court.

16. Witness Francis Lynch had no right to testify as to conversation that passed between himself and wife at any other time except when they saw Ward going out of the barn with the team. *Bartlett* v. *Cabot*, 54 Vt. 242 ; *Warden* v. *Powers*, 37 Vt. 619 ; *Whitney* v. *Houghton*, 125 Mass. 451 ; *State* v. *Davidson*, 30 Vt. 377.

17. Mr. Montgomery's evidence about showing team to Sherrah and as to experiments then made, and driving the team up and down the road to see if Sherrah could identify it, was mere hearsay, and not admissible.

18. It was error to permit the witness Sawtelle to testify that, in his judgment, the track on the wall was made by an overshoe and why he thought so. The State claimed that Ward wore overshoes. Hence it was a material question, and for the jury alone to decide, from the description of the track, whether or not it was made by an overshoe. *Bank* v. *Isham*, 48 Vt. 593 ; *Weeks* v. *Lyndon*, 54 Vt. 638 ; *Oakes* v. *Weston*, 45 Vt. 430 ; *Storr* v. *Bishop*, 58 Vt. 500 ; *People* v. *Hare*, 57 Mich. 512.

19. It was error to admit the new overshoe produced by Drouin, because he had testified that the one he sold respondent was of different make and that makes of same size varied in width and length.

20. The sleigh, lard pail, candles, beets and newspaper, were improperly admitted because there was no evidence in the case tending to connect respondent with them. *Jacobs* v. *Smith*, 34 Md. 204.

21. The whole of Foster's testimony before the justice, which was permitted to be shown, in no way contradicted or explained that part testified to by Mr. May. Hence, it was error to admit it. The State must show that the respondent was not injured by this error. *State* v. *Meader*, 54 Vt. 131.

22. The court assumed that the fire was an incendiary one. This was error. 1 Hale's P. C. 596 ; (Ed. 1778, Dublin); *Phillips* v. *State*, 29 Ga. 105 ; *State* v. *Hopkins*, 56 Vt. 261 ; *Westmore* v. *Sheffield*, 56 Vt. 248.

23. There was error in permitting such comments as were made upon the respondent's conduct. He could not give the explanations, which he was blamed for not giving, without testifying himself. Hence this was in effect a comment on his neglect to testify. *Com.* v. *Maloney*, 113 Mass. 213 ; *Com.* v. *Harlow*, 110 Mass. 411 ; *Willett* v. *People*, 37 Hun. 479 ; *Stokes* v. *State*, 5 Bax. 619 ; S. C. 30 Am. Rep. 72 ; *State* v. *Diskin*, 34 La. An. 919 ; S. C. 44 Am. Rep. 448 ; *State* v. *Cameron*, 40 Vt. 565 ; *Bob* (a slave) v. *State*, 37 Ala. 564 ; *Com.* v. *Scott*, 125 Mass. 239 ; *Com.* v. *McDermott*, 123 Mass. 44 ; *Vail* v. *Strong*, 10 Vt. 463 ; 1st Greenl. Ev. (12th Ed.) ss. 197 and 97a.

24. The charge as to the *alibi* was wrong. Taken in connection with the rest of the case it was contradictory, mis-leading, and tended to confuse the jury. 1 Greenl. Ev. (12th Am. Ed.) ss. 81b and 81c; *Alexander* v. *Blodgett*, 44 Vt. 476 ; *Borce* v. *Danville*, 53 Vt. 183 ; *State* v. *Cameron*, 40 Vt. 564 ; *Hoge* v. *People*, 117 Ill. 35 ; *Johnson* v. *State*, 21 Tex. Ap. 368 ; *Walters* v. *State*, 37 Ohio 215 ; *State* v. *Kelley*, 16 Mo.

Ap. 213; *Humphries* v. *State*, 18 Tex. Ap. 302; *State* v. *Jaynes*, 78 N. C. 504; *Adams* v. *State*, 42 Ind. 373; *People* v. *Kelley*, 35 Hun. 295; *Miller* v. *People*, 39 Ill. 457; *People* v. *Millard*, 53 Mich. 63; *McAully* v. *State*, 74 Ala. 9; *Stuart* v. *People*, 42 Mich. 255; *State* v. *Meyer*, 58 Vt. 463; *People* v. *Fong-Ah-Sing*, 64 Cal. 253; *Harrington* v. *State*, 19 Ohio stat. 268; *Walker* v. *State*, 42 Tex. 370; *State* v. *Johnson*, 21 Tex. Ap. 381; *Ayers* v. *State*, 21 Tex. Ap. 405; *Howard* v. *State*, 50 Ind. 191 and 192.

25.   The charge as to the effect of setting up the *alibi*, if not proven, was wrong.   *Turner* v. *Com.*, 86 Penn. St. 54; S. C. 27 Am. Rep. 683.

*H. C. Ide, Marshall Montgomery* and *C. A. Prouty*, for the State.

1.   Mr. Ide was properly appointed as special prosecutor. *State* v. *Bartlett*, 55 Maine 200; Wharton's Criminal Law, s. 3002, and cases there cited; *Commonwealth* v. *Scott*, 123 Mass. 223.

2.   The statute giving the State peremptory challenges is constitutional.   *Com.* v. *Dorsey*, 103 Mass. 312; *Walter* v. *People*, 32 N. Y. 147; *Jones* v. *State*, 1 Ga. 610; *Warren* v. *Com.*, 37 Pa. St. 45; *Hartzell* v. *Com.*, 40 Pa. St. 462; *State* v. *Wilson*, 48 N. H. 390.

3.   It was not supposed that Stafford would be a witness when the order excluding the witnesses for the State was made. Hence, he did not fall within it.   Roscoe's Crim. Ev. *supra; Powell* v. *State*, 13 Texas Ct. App. 244; *Lasiter* v. *State*, 67 Ga. 739.

4.   The exception to the statements of counsel in both the opening and close come too late, even if the language was objectionable, which we deny.   *Commonwealth* v. *Worcester*, 141 Mass. 58.

5.   Evidence of the previous attempt was admissible.   *Commonwealth* v. *McCarthy*, 119 Mass. 354; *Commonwealth* v. *Bradford*, 126 Mass. 42; *Commonwealth* v. *Jackson*, 132 Mass. 16; 1 Wharton Crim. Law, ss. 635 and 635 A; 635 E; 635 G; and 653 H; and cases there cited, and s. 649, Hayrick case; *State* v. *Edwards*, La. 15 Report, 370.

6.   Evidence of the relations between Olivia Amsden and the Fosters was proper.   In no other way could the extent and force of the alleged motive be shown.   *State* v. *Klim,* 54 Ia. 183 ; Roscoe's Crim. Ev. pp. 92–97 and cases there cited.

7.   The conversations between Olivia and the respondent relative to the burning of these buildings was admissible.   His own declarations were clearly so ; and the meaning of these could not be fully understood without knowing what she said to which they were a reply.   *State* v. *Bartlett,* 55 Me. 217, *Kelley* v. *People,* 55 N. Y. 565 ; Roscoe's Crim. Ev. page 18 ; *Liles* v. *State,* 30 Ala. 24 ; American Dec. vol. 62, pages 185–6 ; Wills on Circumstantial Evidence, 276 ; *Commonwealth* v. *Brailey,* 134 Mass. 527.

8.   The fact that Lynch and his wife spoke to one another about seeing the team on the night in question was properly admitted to fix the night.   Being admissible in that view, it should have been received, although on some other ground it was objectionable.   *Earl* v. *Earl,* 11 Allen, and *Hill* v. *North,* 34 Vt. 604 ; *Commonwealth* v. *Piper,* 120 Mass. 185 ; *McDonald* v. *Savoy,* 110 Mass. 49.

9.   The testimony of Sawtelle that the track appeared to have been made by an overshoe was within the rule.   *Bates* v. *Sharon,* 45 Vt. 474 ; *Smith* v. *Miles,* 15 Vt. 249 ; *Folsom* v. *Concord,* 46 Vt. 135 ; *Commonwealth* v. *Sturtevant, supra* ; *Commonwealth* v. *Pope,* 103 Mass. 440.

10.   All implements or articles claimed to have been used in connection with the crime may be exhibited to the jury.   Wharton's Crim. Law, 731 ; *Commonwealth* v. *Brown,* 121 Mass. 69 ; *Commonwealth* v. *Clark,* 14 Gray, 419 ; *Commonwealth* v. *Williams,* 2 Cush. 582 ; *Commonwealth* v. *Costly,* 118 Mass. 1 ; Ind. Sup. Ct., *McDonel* v. *State,* 18 Cent. L. J. 374.

11.   A witness may testify to an indistinct recollection, the weight of such testimony being for the jury.   1 Green. Ev., s. 440 and cases cited ; *State* v. *Donovan,* Ia. 16 N. W. Rep. 130 ; *Clark* v. *Bigelow,* 16 Me. 246 ; *Humphries* v. *Parker,* 52 Me. 502.

State *v.* Ward.

12. When it is sought to discredit a witness by showing a part of his testimony on a former trial, the whole may be developed. *People* v. *Cox*, N. Y. 1880, 10 Rep. 784, and cases there cited; *Platner* v. *Platner*, 9 Rep. 53; 25 N. Y. 170; 1 Green. on Evidence, ss. 467 and 462, note 1; *Cox* v. *State*, 8 Tex. Ap. 75; 47 Vt. 222; Roscoe's Crim. Ev., p. 103 (note) and cases cited; 1 Starkie Ev., marginal pages 208 and 210.

13. The conduct of the respondent in not taking any steps to prove his whereabouts the night of the fire and of the previous attempt until long afterwards was properly commented upon by the counsel for the State in closing. *Commonwealth* v. *Webster*, 5 Cush. 295; *Rex* v. *Burdett*, 4 Barn. & Ald. 121 and 140; *Commonwealth* v. *Clark*, 14 Gray 367; *Reynolds* v. *Sweetzer*, 15 Gray 78; *Woodward* v. *Leavitt*, 107 Mass. 453; *Commonwealth* v. *Costly*, 118 Mass. 1; 1 Wharton's Crim. Laws, s. 744; Roscoe's Crim. Ev. pp. 53 and 54; *Gordon* v. *People*, 33 N. Y. 501; *Johnson* v. *Commonwealth*, 7 Cent. Reporter, p. 608 (Pa.)

14. The jury could not have understood that the court withdrew from them the consideration whether or not the fire was a willful and malicious one, or that they could convict the respondent without finding this fact. *State* v. *May*, N. E. Rep. p. 846 (Me.); *State* v. *Fenlason*, 3 N. E. 273 (Me.); *State* v. *McLellan*, 70 Me. p. 285; *People* v. *Biggins*, 231 Reporter (Cal.)

15. The court correctly charged as to the law of *alibi*. *Commonwealth* v. *Webster*, 5 Cush. pp. 319 and 324; Wharton's Crim. Law, ss. 708 and 744; *Fife* v. *Commonwealth*, 29 Penn. St. 429; *State* v. *Vincent*, 24 Iowa 570; *Commonwealth* v. *Choate*, 105 Mass. 451; *State* v. *Kline*, (Sup. Ct. Iowa) 2 Cr. L. Mag. 643.

It instructed the jury that they must be satisfied beyond a reasonable doubt, taking into account the *alibi* evidence with all the rest, and this is the law in Vermont. *State* v. *Cameron*, 40 Vt. 555; *State* v. *Nutley*, 57 Vt. 543.

(12)

16. The introduction of a fabricated *alibi*, if clearly established, should make against the respondent. *State* v. *Williams*, 27 Vt. 726; Wharton's Criminal Law, ss. 715 and 716.

17. The charge as to circumstantial evidence was correct. *Rider* v. *Miller*, N. Y. 1880, 10 Rep. 784; *Commonwealth* v. *Webster;* *supra;* Wharton's Criminal Evidence, s. 732 and notes.

The opinion of the court was delivered by

TAFT, J. 1. This court held that it was not legal error to appoint as prosecutor in a criminal proceeding an attorney who was, at the time, acting as counsel in a civil suit against the respondent, to recover damages for the acts upon which the criminal action was based. Such appointment was within the discretion of the court below, and its exercise will not be revised by us. *State* v. *Miller*, Sup. Ct. Wash. Co., May term, 1887.

2. It is contended that it was error to allow peremptory challenges by the State, for that the statute permitting them is in conflict with the Bill of Rights, s. 10, which guarantees to a respondent a trial by jury, which has been held, in *State* v. *Peterson*, 41 Vt. 518, to be a common law jury, and that at common law no peremptory challenges were allowed in behalf of the government. By the ancient common law the crown could challenge without limit, but the "Ordinance for inquest," 33 Ewd. 1 Stat. 4, narrowed the challenges down to those for cause shown. "There was," said Lord Campbell, C. J., "no intention of taking away all power of peremptory challenge from the crown, while that power, to the number of thirty-five, was left to the prisoner." *Mansell* v. *Reg.*, 8 El. & Bl. 54, 71. The effect of the statute was early mitigated by a rule of practice, not to compel the crown to show cause against the juror at the time of the challenge. The juror was directed to stand aside, and the defendant having completed his challenging, if a panel could be procured from the unobjectionable jurors remaining, these were selected, and it was only in case of a deficiency that the crown was called upon to show cause in respect to those members who had been directed to stand aside. As the court could direct the

State *v.* Ward.

return of any number of jurors for the trial of a particular case, the crown practically was never deprived of the right in substance. This was the settled practice as early as 1699, Cowper's case, 13 How. St. Tr. 1108. While the crown could not insist upon the rule, as a legal right, and it was often questioned, it was said, by Buller, J., in O'Corgly's case, 26 How. St. Tr. 1240, that it was "as firmly and as fully settled on this point as any one question that can arise on the law of England," and since this time the practice has never been successfully questioned in England. Thus, at the time of the adoption of our constitution, the crown, in summoning, *ad libitum,* and standing aside, jurors, possessed all the advantages obtained by peremptory challenge. But were this not so, what the constitution guarantees is a trial by a common law jury, *i. e.,* one of twelve impartial men, and it is within the legitimate scope of legislation to regulate the manner of selecting them and conducting the trial; nor, are we aware, has it ever been held otherwise. *Walter* v. *People,* 32 N. Y. 147.

3. At the request of the respondent, the court ordered "the witnesses examined separately and apart from each other." The respondent called as a witness one Carrick to prove an *alibi.* In rebuttal of his testimony, the State was permitted to use Mr. Stafford, an attorney of the court, as a witness; he had been present during the trial, and testified upon a matter to which no other witness was called. We think the case should fall within the rule stated by Royce, Ch. J., in *State* v. *Hopkins,* 50 Vt. 316, and reaffirmed in *State* v. *Lockwood,* 58 Vt. 378. It could not have been the intent of the rule to exclude from the court-room an attorney whose duty to his clients might require his presence in the room at almost any time during the session, in the transaction of business with the clerk, and the other attorneys. The spirit of the rule could not be violated where the witness is the only one testifying upon the subject to which he is called. Such was the fact in this case, and the respondent could not have been injured by Stafford's presence in the court-room during the trial. In Georgia it has been held that if a witness

remains in the court-room, under the rule, he is not thereby rendered incompetent, but may be proceeded against for contempt. *Lassiter* v. *State*, 67 Georgia 739. The following cases sustain the ruling below : *Parker* v. *State*, 67 Md. 329 ; *Haskins v. Com.*, (Ky.) 1. S. W. Rep. 730 ; *Leache* v. *State*, (Tex.) 3 S. W. Rep. 539 ; *Rummel* v. *State*, (Tex.) *ibid* 763.

4.   The respondent insists that the remarks made by Mr. Ide, in his opening statement to the jury, were improper.   Objection was made and exception taken after he had closed his remarks. The objection was made too late ; it should have been made at: the time of the statement, and the ruling of the court taken. The question, in this respect, is analagous to that of the introduction of illegal evidence without objection.   The party against whom it is given cannot afterwards raise the question.   This has been held to be the rule during the argument of the cause, much more should it obtain during an opening statement, when the jury are told by counsel, as they were in this case, that what he stated was not evidence.   *Com.* v. *Worcester*, 14 Mass. 58 ; *Willingham* v. *State*, 21 Fla. 761.

5.   Exception was taken to a part of the closing argument made by Mr. Ide for the prosecution.   No objection was made to it at the time of its delivery, and we think, judging from the length and nature of the statements claimed to have been illegal, and the well-known vigilant character of the respondent's counsel, that none was intended.   Where counsel sit still during an argument which they claim is illegal and make no objection thereto, an objection afterwards is too late.   The exception is waived by their silence.   This court sits in revision of errors made in the ruling, and the refusal to rule, of the court below.   Upon this question the court made no ruling, did not refuse to make one, and therefore there is nothing for us to revise.

6.   The respondent excepted to an offer to prove a certain fact, evidence of which was excluded.   There is nothing in the case to show that the offer was made in bad faith, and in the absence of such showing we cannot hold that it was error to offer to prove such fact.   The ruling was in favor of the respondent, and he ought not to complain of it.

7, 22. One witness was permitted to testify that the horse on the morning of the 27th of January appeared tired; another that, in his opinion, the track on the wall was made by an over-shoe, and another that in his opinion the tracks in the snow were sleigh tracks. The point taken is that the witnesses testified to their opinions and not facts from which the jury could form opinions of their own. A witness is allowed to state appearances in any case where they are in their nature incapable of exact and minute description, *e. g.,* the health or sanity of a person; the appearance of a person when charged with a crime and "where the facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation; he is allowed to a certain extent, to add his conclusion, judgment or opinion." *Bates* v. *Sharon*, 45 Vt. 474. Under this rule the evidence was properly admitted. See *Crane* v. *Northfield*, 33 Vt. 124, and see *Stowe* v. *Bishop*, 58 Vt. 500; *Knight* v. *Smyth*, 57 Vt. 529.

8. The buildings were burned on the 26th of January, 1886, and the evidence tended to connect the respondent with the burning. The State were permitted to show that an attempt was made to burn them four weeks prior to that time, but the respondent insists that there was no evidence tending to connect him with it. It had a tendency to show that he took a horse and left St. Johnsbury; that he went to Walden and returned, to the same place that he went to, at the time of the fire, but by a different route; this, with that tending to show a motive upon his part to commit the crime, had a tendency to connect him with the attempt, and if believed would be pertinent upon the question of whether he committed in January the crime which he attempted to commit the preceding month. Evidence of previous unsuccessful attempts to commit the same crime for which a respondent is on trial, is admissible. *Com.* v. *Jackson*, 132 Mass. 16. Evidence of previous threats to burn Foster's

buildings would have been admissible, we think evidence of
an attempt to carry such threats into execution, equally so. It
is too clear to require discussion. The cases cited on this point,
are mostly those of other and distinct crimes, such as *State* v.
*Hopkins,* 50 .Vt. 332 ; *Brock* v. *State,* 26 Ala. 104; *People* v.
*Sharp,* 107 N. Y. 427, and others ; or to show previous attempts.
to commit the same crime without evidence to connect the
respondent with them, as in *State* v. *Freeman,* 4 Jones (N. C.)
105. We should not be inclined to follow *Baker* v. *People,*
105 Ill. 452, where it was held that upon a trial for an attempt
to commit an abortion, a prior attempt to commit it upon the
same person during the same pregnancy could not be shown.

9. It is insisted that the court erred in admitting evidence of
the sleigh tracks, and experiments with the sleigh, for the rea-
son that there was no evidence to connect the respondent with
the tracks. The evidence tended to connect him with the fire,
and tended to show that the one who set the fire was with the
sleigh which made the tracks on the Goodenough road. To make
such evidence admissible it was not necessary to show that the
respondent was actually seen with the sleigh upon the road. It
was enough to give evidence tending to show he was there with
it, and there was ample evidence in the case for that purpose.

10, 15, 16, 17. The prosecution claimed, and the evidence
tended to prove, that very intimate relations had existed between
the respondent and Miss Olivia Amsden ; that he desired to pos-
sess her in marriage ; that these relations had been broken off,
and she had refused to marry him, through influence of her fos-
ter parents, the Fosters ; that he was aware of these facts and in
revenge committed the crime to injure them, because they had
interfered between him and her, either to take revenge upon
them for such interference, or to wound her by injuring those
to whom she was much attached, and who stood to her *in loco*
*parentis.* These were legitimate claims upon the question of
the respondent's guilt. The motive actuating a person in the
commission of a crime is always pertinent; " when crime has
been proved and circumstances point to the accused as the per-

petrator, facts tending to show a motive, though remote, are admissible." *Summerville* v. *State*, 6 Tex. app. 433. This is not controverted by defendant's counsel, but it was the character of the evidence admitted to show the motive, which they criticised. We think the evidence admitted was legitimate, as tending to show facts from which the motive might be found by the jury.

*a.* The testimony of Foster as to the relations existing between Miss Amsden, and himself and wife was certainly pertinent, and the objection that the details of the relations were given, is not borne out by the record, for he was directed to state what they were " without going into the details " and a careful scanning of the exceptions pp. 8 and 9 fails to disclose an instance of his having done so. The testimony of Olivia that she had informed Ward of what the Fosters had said to her about him, and her being with him, was material to show knowledge on his part of their objection to her relations with him. We think that whatever the Fosters said to her about Ward, which she communicated to him, was legitimate upon the question of motive. The objection was general and the testimony being proper for one purpose there was no error in admitting it, it not appearing that it was used for any other purpose. What the Fosters said, it being communicated to Ward, in reference to Olivia's relations with him, was evidence upon one of the material issues of the trial, and the case therefore, unlike *Campbell* v. *State*, 8 Tex. Ap. 84, cited by respondent where it was held error for a witness to testify that he told the defendant what his neighbors thought about a matter in controversy. What his neighbors thought was wholly irrelevant, as any instance of hearsay upon an immaterial matter would be.

*b.* The letter which the testimony tended to show was written by Ward to Olivia's sister, was strong evidence to show the relations theretofore existing between Ward and Olivia, and Ward's knowledge or belief that the Fosters influenced her against him.

State *v.* Ward.

*c.* The evidence of Olivia in regard to her conversation with Ward at the railroad station was admitted upon the question of Ward's connection with the team. It tended to show an admission by him that he had the team both nights and so far as the case shows was used for that purpose only, and was in every respect legitimate.

*d.* The letters and postal cards had a tendency to show the past intimate relations of Olivia with the respondent, the termination of them against his will, and threats against Olivia, and were material upon question of motive.

11. In the early part of the trial some inquiries indicated that a claim might be made that Foster burned the buildings for the purpose of procuring the insurance money; in view of this fact it was permissible to show what his conduct was at the fire. The fact that he might feign conduct for the purpose of deceiving the bystanders would not determine the question of its competency. If he had fired the buildings the less likely he would be to burn himself in fighting the fire, and his conduct and acts at the fire might be very significant, in the eyes of the jury, upon that question.

12. In view of the same claim it was proper to show the value of the buildings destroyed, but the value of the land of Foster was a collateral fact and therefore immaterial. In the cases cited to sustain this point, *Wood* v. *McGuire*, 17 Geo. 318, and *Hyland* v. *Miller*, 99 Ind. 309, the error consisted in depriving the excepting parties of the cross-examination of witnesses to material facts.

13. The witness Osgood testified that he heard a team pass Wilson's house on the night of the 29th December; he was at Wilson's house several nights both before and after the 29th, and the evidence tended to show that the team passed the night one Ryan was his co-watcher. We think it was proper in testing his accuracy as a witness to ask him whether that was the only night he heard a team pass. The fact that he heard a team pass but one night, and that its passage was spoken of by him and Ryan at the time might in connection with the other circum-

stances, enable the jurors to determine whether it was the night of the 29th or of some other day, that the team passed.

14. The question asked Streeter was not objected to until the answer had been given. There is nothing in the record to show that the question was answered before an objection could have been interposed, and we should not presume it, upon suggestion of counsel. Whether the question was improper we are not called upon to decide.

18. The testimony of the State tended to show that the person who set the fire took a team from the stable in St. Johnsbury, drove to the Noyesville road in Walden, then on the Hazen and Goodenough roads to a point on the latter, where he left the team, went to the Foster buildings, fired them, went back to the sleigh, turned it about, and returned to St. Johnsbury, by the same route over which he traveled in going from it; that in going to the place where the team was left in the road, in passing from one road to the other a sharp angle was turned in each instance. Under exception the State was permitted to show that the horse, driven over the same route within four days after the fire, left to itself and without guidance, instead of passing the two roads, at the point of junction, voluntarily made the turns conforming to the route leading to the tracks and place of turning on the Goodenough road. Was the admission of this testimony error, or, in other words, was this testimony evidence in the strict sense of the term? "The word evidence is applied to that which renders evident" and is defined to be any matter of fact, the effect, tendency, or design of which is to produce in the mind a persuasion, affirmative or disaffirmative, of the existence of some other matter of fact. Best on Evidence, s. 11. "Does the fact that when the horse was driven into the vicinity of Foster's on Saturday, he voluntarily left the road upon which he was traveling and turned into the Hazen and Goodenough roads, have a tendency to produce in the mind a persuasion that he had been there the prior Wednesday? If so it was evidence of the fact. The testimony tended to show that the horse had the habit of turning into premises and roads where he had before been driven,

and every one familiar with horses is aware of their constant. habit and custom in that respect; so much so that they can often be trusted to go without drivers in such places. We think the testimony had a tendency to create in the mind a persuasion that the horse had been there before; to render that fact evident. The question is not how strong a persuasion, but had it a tendency to create any? We think the invariable answer would be yes, and the testimony was properly admitted.

19. The witness Clutier testified that the respondent had the team the night of the attempt to burn Foster's buildings, and what was said by him about it when he returned it; and that he testified before the justice upon the same matter. It was material to show what he testified to before the justice in connection with admissions which it was claimed the respondent made. The court then permitted counsel for the State to ask if he testified before the justice substantially as he had upon trial. In this there was no error, although the respondent would have had the right to have the details of his former testimony given, if he requested it. If leading the court had a right to permit it.

20. Testimony for the respondent tended to show that at nine or half past nine o'clock, the night of the fire, he was at Littleton, N. H. Lynch testified that he saw a horse in respondent's barn at about six o'clock one evening, and Lynch's wife testified she saw the respondent at his barn harnessing a horse at about nine o'clock one evening. And that at a later hour that evening the horse was gone. Testimony tending to show that the fact that the horse was there, at respondent's barn, and was afterwards taken out, was spoken of between Lynch and his wife, the evening that each testified they saw the horse there, was objected to and admitted under exception. The fact that they had conversation about the horse would tend to show that they were testifying about the same evening, and for that purpose was admissible. For that purpose the details of a conversation are sometimes held admissible. *Earle* v. *Earle,* 11 Allen 1; *Hill* v. *North,* 34 Vt. 604. Testimony of a like character was held inadmissible in *Whitney* v. *Houghton,* 125 Mass. 451, but it was

upon the ground that declarations by a party in his own favor could not be shown. If the testimony in this case was inadmissible, whether the court erred in charging it out of the case, we do not pass upon.

21, 25, 26. The testimony of Montgomery, Smith and Sulloway, mentioned in these points, was clearly admissible upon the question of identifying the sleigh.

23. It was not error to permit the witness Drouin to exhibit an overshoe. He had testified that he sold the respondent one the year before, of the same size and width of the one shown; there was testimony in the case tending to show the length and width of the track which, it was claimed, was made by the respondent, near Foster's house, the night of the fire. In connection with this testimony it was proper to exhibit the overshoe. It would enable the jurors to judge whether the tracks described could have been made by the respondent.

24. The respondent further insists that there was error in admitting as evidence the sleigh, lard pail, candles, beets and the newspaper, upon the ground that there was no evidence tending to connect the respondent with the same. We have held, under point eight, that the evidence tended to connect him with the attempt to burn the buildings in December, and it tended in like degree to connect him with the articles used upon that occasion, and with the sleigh and newspaper; these articles having been used in connection with the commission of the crime and the prior attempt to commit it, or by the perpetrator of it, were properly placed before the jury for their inspection in connection with the other testimony.

27. Sulloway testified that he did not know that Ward had used a hitching weight, but his impression was that he had seen him use one. His testimony indicated that the fact was impressed with some strength upon his mind, not amounting, however, to positive assurance. Witnesses often say, "That is my impression," "I think so," "I'll not positively say so, but that is my impression." We think it competent testimony; the fainter the impression the less weight it should have. *Clark* v. *Bigelow*, 16 Me. 246; *Humphries* v. *Parker*, 53 Me. 502.

28. The testimony of Montgomery in relation to the time he talked with several of the witnesses was properly admitted, for the purpose of fixing the time to which they testified. It was admitted for that purpose only.

29. To discredit Foster, May testified to facts tending to show that Foster on the trial testified differently than he did on the hearing before the justice. May stated a part of Foster's testimony; the court properly admitted evidence of all of it. To impeach a witness by showing a part of what he said would be unjust; all he said should be shown; then the jury can judge whether his statements are inconsistent with his testimony. It is argued that its admission rendered the truth of Foster's other testimony more probable in the minds of the jury. This would naturally be the effect of removing the impeachment of Foster, if any, and for that purpose was legitimate.

30. Exception was taken to the statements of the court in its charge, that there was no claim that the fire was an innocent one; that it was the wicked and malicious act of somebody, that it was maliciously set. The exceptions show that it was not claimed on trial that the fire was an innocent one; the case was tried upon the opposite theory; the statements of the court were true. Was it error to so state? It was the duty of the court to charge the jury upon every phase of the case, without request; to present the case to them as plainly as possible, to eliminate all controverted matters and distinctly point out the precise issues. Facts about which there is no dispute and concerning which no issue is made may properly be called to the attention of the jury in the discretion of the presiding judge. *State* v. *Stenlason*, 78 Me. 495; *State* v. *Day*, 79 Me. 120. To enable the jurors to act intelligently the court could adopt no wiser course than to explain to them the respective claims of the parties. The only danger from this that could possibly have happened to the respondent was for the jury to get the impression that it was not necessary to find the body of the crime proven. We think they could not have done that from the remarks of the judge; the language used negates such an idea; the

State v. Ward.

judge said that everything in the case pointed with great force to the fact, not that it was an accidental fire, but that somebody purposely, maliciously, set it. We think the court did not assume and was not understood to assume that any disputed fact was proven. It would be casting too great a slur upon the intelligence of the jurors to think they received the impression from the words used by the court that they could convict, without finding the fire purposely and maliciously set. To suppose they did imputes to them much less than ordinary intelligence. The question was not taken from them in the least. The court made the remark simply as a reason why it did not give them a full and technical definition of the crime. It did do so substantially, when it called the act a wicked, malicious burning, intentionally caused. This holding is not in conflict with *Phillips* v. *State*, 29 Ga. 105, cited by the respondent upon this point, where a charge that if it did not appear that the fire was caused by some accidental or providential cause, the law implied a malicious burning, was held erroneous. The law makes no such implication, the jurors in this case were not so told, but simply that the facts pointed to a malicious burning, and were then left at liberty to find one or not from the evidence.

31. The duty of the court required it to explain to the jury the law applicable to a case of circumstantial evidence. Exception was taken because the court said that many great jurists have pronounced it "of a nature equally satisfactory with positive evidence and less liable to proceed from perjury." Counsel admit that perhaps the judge had the right to tell the jury what he thought of it, but deny his right to cite the authority of great jurists. When we consider that the law is made up of the opinions of jurists, and that it was the duty of the court to tell the jury what the law was, it cannot be held error that the presiding judge referred to such opinions and told the jury what they were. It is not contended that the opinions of the great jurists upon the question were unsound, but that the court had no legal right to tell the jury what they were. We think there was great propriety in telling the jury so, in giving them to un-

State *v.* Ward.

derstand that it was as proper to convict on circumstantial evidence as on positive evidence and in citing the opinions of the learned sages of the law. There is no difference between stating a rule to the jury, and reading it to them from the text books, written by great jurists. The latter has always been the practice in this country, at least in most of the States. In the celebrated case of *Commonwealth v. Webster,* 5 Cushing 200, the learned Shaw, Ch. J., read the whole of several sections of Easts' Pleas of the Crown, relating to the law of homicide and read from a text book " that in some cases perhaps strong circumstantial evidence was the most satisfactory of any." In *State* v. *McDonnell,* 32 Vt. 491, Bennett, J., in the trial read copious excerpts, from the text books, Hale's and Easts' Pleas of the Cr., Foster's Cr. Law; Wharton on Homicide and Russell on Cr.; as well as from the reports, and while the practice of reading text books to the extent to which it was carried in that case was severely criticised by Redfield, Ch. J., it was in no wise intimated that it was legal error. Like instances might be cited *ad libitum.*

32. An exception was taken " to the charge as to the conduct of the respondent and inference to be drawn by the jury therefrom " in that the court gave no instruction as to what kind of conduct was evidence of guilt. The evidence in relation to his conduct had been admitted during the trial and presumedly the jurors understood at the time the purpose for which it was admitted, and this being so there is nothing in the case to show that the nature and character of the evidence as to the conduct of the respondent was not understood at the time of its admission by the jurors, and the court were not under any duty to explain to them what they already presumedly knew. It will be noticed that the exception was to the charge as given, not to a failure to charge, which is the question mainly argued in the respondent's brief. The criticisms are, that the court gave no instructions, etc. : not a complaint of what the court said, which would be covered by the exception, but of what it did not say which is not within it. Under this exception the counsel criti-

State *v.* Ward.

cise the course of the trial permitted by the court, claiming that the fact that the respondent did not testify in his own behalf was considered against him. We do not understand from the exceptions that the statute R. L. s. 1655, which provides that the refusal of a respondent to testify shall not be considered by the jury as evidence against him, was in the least degree violated by either court or counsel. It is evident from the whole case that the fact that the respondent did not produce testimony to show where he was on the two nights in question, told strongly against him, for it seems improbable, to say the least, that he could have twice taken a team at St. Johnsbury, driven fifteen or twenty miles and returned without being able to show by some witness his whereabouts. Had he gone to Littleton on the night of the fire, as he claimed, is it probable that he could have gone there and been in the village for a time without being able to call some person with whom he came in contact to show he was there?

If he failed to do so the inference was strong that such was not the fact; and as we understand the case it was this failure to show where he was at the critical moment, and not that he did not testify on the trial, that was commented upon by the counsel, and as we think properly. If the jury were satisfied that on the night of the fire and of the attempt to set it, the respondent was in some place other than the *locus criminis* and could have called witnesses to prove it, his failure to do so was a proper matter of comment by counsel and consideration by the jury. The rule is well stated by Poland, Ch. J. in *Seward* v. *Garlin*, 33 Vt. 583, " A failure to produce proof, when in the power of the party, is recognized even in criminal cases, as proper to be considered by the jury." " Under Va. Code 1887, chap. 190, s. 3897, prohibiting comments upon the prisoner's failure to testify, it is not error for the prosecuting attorney to remark that the respondent has not accounted for his whereabouts at the time of the homicide." *Sutton* v. *Com.,* (Va.) 7 So. E. Rep. 323.

33.   Exception was taken to the charge on the subject of *alibi.* The jury were told that if the proof of it did not outweigh the proof that he was at the place when the crime was committed it was not sufficient.   In this statement there was no error.   Where an *alibi* is proved it is an absolute bar to the prosecution, and constitutes the best possible defense.   It is a direct attack upon the case made by the State by alleging a fact wholly inconsistent with it, for one person cannot be in two places at the same time.   If a respondent can show that he was at another place when the crime was committed, the conclusion is irresistible that he did not commit it.   The respondent alleges it, not in his pleadings, as it can be shown under the general issue of not guilty, but in his proof, as a full substantive defense, and alleging it, he must prove it.   It is a defense resting upon extraneous facts not arising out of the *res gestæ,* and the *onus* of proving it rests upon the respondent who alleges it.   The burden being upon him, some courts hold "that the evidence must exclude the possibility of the prisoner's having been at the scene of the crime so as to prove the *alibi* beyond a reasonable doubt;" others that it must preponderate or outweigh that of the State.   The latter was the rule adopted in the court below, and, we think, correctly.   But it must be taken in connection with the rest of the charge.   Had the above been all the charge upon the *alibi* evidence, there would be just ground of complaint; for, while the evidence might not have been sufficient to establish an *alibi,* it was not, therefore, to be discarded, laid out of the case, not considered by the jury, which has been the error in many of the American cases, *e. g., Walters* v. *State,* 39 Ohio 215, where the jury were told unless the testimony established an *alibi* by a preponderance it was not to be considered.   Such cases are clearly erroneous.   The attitude of the case at bar was this, an *alibi* was alleged, and the jury were told that the evidence to prove it must outweigh the evidence to show the respondent at the place of the crime, and if so established they should acquit him.   After this instruction it was the duty of the court to go further, and to tell the jury that if the *alibi* was not so established, that evidence of it was not to

State *v.* Ward.

be excluded from the case, but that it should be considered with the other evidence, and if, upon the whole, including that in relation to the *alibi*, there was a reasonable doubt of the respondent's guilt, he was entitled to an acquittal. Did the court discharge that duty? We think it would be difficult to do it in plainer terms than those used by the court when it said: "But this proof of an *alibi*, even if not sufficient, as against the other evidence, to establish the fact of an *alibi*, does not change the rule I have before stated, that in order to warrant conviction, you must be satisfied upon all the evidence in the case beyond a reasonable doubt. How has all the evidence in the case, including the *alibi* evidence, giving it, in its bearings in all directions, due consideration and weight, left your minds? A party relying on an *alibi* as a defense, must prove it. But the setting it up does not change the presumptions of innocence or the burden of proof on the prosecution, as the same has been explained, that the respondent was at the place of the crime and committed it, and therefore not at home at the time of it." We think the charge covered the whole question and stated the law correctly. As we construe the charge in *State* v. *Cameron*, 40 Vt. 455, it was like the one in this case and was sustained in this court. The charge below was like the one in *Com.* v. *Webster*, *supra*, which has been often followed by the courts and cited with approval in text books. Instructions like those below were held not contradictory in *State* v. *Maher*, Iowa 37 N. W. Rep. 2, 5; *Ackerson* v. *People* (Ill.), 16 N. E. Rep. 847; *State* v. *Kline*, 54 Iowa 183; *State* v. *Reitz*, 83 N. C. 634; *People* v. *Ansing*, 64 Cal. 253; *State* v. *Reed*, 62 Iowa 40; *State* v. *Henrick*, *ibid* 414, and see *State* v. *Johnson*, (Mo.) 3 S. W. Rep. 868.

In many of the later cases upon this subject no instructions have been given in relation to the testimony offered to prove an *alibi*, considered separately and apart from the main question, and we think the courts are tending in that direction, and to hold

(13)

that the defense of an *alibi* does not demand specific instructions from the court, and for one I am inclined to think it the better practice, although it is not erroneous to follow that of the court below, which I think more favorable to the respondent. In *State* v. *Sutton,* 70 Iowa 268, the accused relied for his defense upon an *alibi,* the court omitted any special instructions as to it, but gave the jury a general direction to consider all the facts in the case and give the defendant the benefit of a doubt arising upon all the evidence, and the court held that the omission to instruct specially as to the *alibi* did not prejudice the defendant.

34. The next exception noted is to the charge upon the subject of introducing false evidence of an *alibi.* The jury were told that the introduction of false or fabricated evidence constituted a circumstance against the respondent and was an inferential admission of guilt but not conclusive; that the fact that he had been guilty of producing the false and fabricated evidence should be established beyond all question; that if it was doubtful, no weight should be given it, *i. e.,* to use the fact that he had offered and used false evidence as a circumstance against him the jury must be satisfied beyond all question that he was guilty of fabricating it, or in other words introducing it knowing it to be false. The charge was correct. *State* v. *Williams,* 27 Vt. 724.

35. Was the conviction under the second and third counts legal? The second count was for burning the shed and barns under s. 4128 R. L. The third was for doing the same act with intent to burn the dwelling house under s. 4127 R. L. The same act was charged in both counts, but with different intent. There can be no objection to joining a count under each section in one indictment. It is often necessary to insert in one indictment many counts charging the crime in as many different ways, in order to meet the various phases of the case as developed by the evidence, and after a general ver-

State *v.* Ward.

dict if one count is sufficient, and others bad, the court will pronounce judgment upon the good count only; if all are good, judgment will be rendered upon the count charging the highest offence. *State* v. *Hooker*, 17 Vt. 658.

36. The last point in the respondent's brief is a criticism upon the charge, but not upon any legal question presented by the exceptions, except such as have been above noticed.

*No error is disclosed by the record, the respondent takes nothing by his exceptions; the judgment is affirmed; sentence imposed upon the verdict and execution ordered.*

All concur.